INSURANCE CORPORATION OF AMERICA, a Texas Corporation, Appellant, *v.* ALEXANDER J. RUBIN, M.D., Respondent.

No. 20543

INSURANCE CORPORATION OF AMERICA, a Texas Corporation, Appellant, *v.* BETTY ROSE WESTON, as Guardian Ad Litem for BRANDY BATTISTE; RAYMOND BATTISTE, ROXANNE BATTISTE, Respondents.

No. 21627

September 30, 1991                    818 P.2d 389

*Wait & Shaffer,* Reno, for Appellant.

*Alverson, Taylor, Mortensen & Gould,* and *Daniel E. Curriden,* Las Vegas, for Respondent Rubin.

*Galatz, Earl, Catalano & Smith,* Las Vegas; *Spence, Moriarity & Schuster,* Jackson, Wyoming, for Respondents Weston and Battistes.

## OPINION[1]

*Per Curiam:*

This case centers on the meaning of the word "occurrence"

---

[1]By order of this court, filed February 8, 1991, these appeals (Docket Nos. 20543 and 21627) were consolidated for argument and disposition.

found in a liability insurance policy. Appellant Insurance Corporation of America (ICA), issued a policy to respondent, Dr. Alexander J. Rubin, with a limit of $200,000.00 per "occurrence" of malpractice and an aggregate limit of $600,000.00 per year. Respondents, Brandy, Raymond and Roxanne Battiste (Battistes),[2] sued Dr. Rubin alleging malpractice in the diagnosis of Brandy Battiste, a young girl who has since been rendered blind as the result of a brain tumor. Dr. Rubin examined and treated Brandy on five separate occasions. According to Dr. Rubin, he made a separate and independent diagnosis on each occasion. Dr. Rubin never diagnosed a brain tumor.

In an action seeking declaratory relief, the district court granted Dr. Rubin's motion for partial summary judgment, finding that, under the terms of the liability policy, an "occurrence" took place each time Brandy visited Dr. Rubin's office and was diagnosed. The Battistes eventually filed their own motion for summary judgment which was also granted. After summary judgment was granted, all of the interested parties negotiated and signed a settlement agreement. This eight-page agreement, which was signed by a representative of ICA in April of 1989, provided that the Battistes would release all claims in exchange for at least $200,000.00 but not more than $600,000.00. Under the agreement, the actual amount of settlement is to be determined based upon the court's final determination of the insurance coverage afforded under Dr. Rubin's ICA liability policy. The settlement provides for an original payment of $200,000.00 and possible further payment depending on the final interpretation of the policy by the courts.

Entry of summary judgment is proper only when there are no issues of fact and the moving party is entitled to judgment as a matter of law. Mullis v. Nevada National Bank, 98 Nev. 510, 512, 654 P.2d 533, 535 (1982). Further, an action for declaratory relief seeking the interpretation of an insurance policy generally presents a question of law that may be determined on a motion for summary judgment. Neumann v. Standard Fire Ins., 101 Nev. 212, 699 P.2d 105 (1985); National Fire Ins. v. Reno's Exec. Air, 100 Nev. 360, 682 P.2d 1380 (1984).

ICA contends that summary judgment was improper because respondents presented no evidence showing that Dr. Rubin's negligence caused Brandy's injuries. The order of partial sum-

---

[2]Brandy is represented by her guardian ad litem, Betty Rose Weston. Weston brought the original action along with Raymond and Roxanne Battiste. For purposes of convenience, all of these respondents will collectively be referred to as the "Battistes."

mary judgment issued below does not make any specific findings or conclusions; rather, it simply provides "that plaintiff's motion for partial summary is granted. . . ." The grant of summary judgment on the declaratory relief action appears to stand for the proposition that the policy's appropriate limit of liability is $600,000.00 based upon the conclusion that each diagnosis by Dr. Rubin was an "occurrence" under the terms of the policy. ICA correctly points out that there was no finding by the court that each of these "occurrences" amounted to negligence.

ICA argues that a factual determination with respect to Dr. Rubin's alleged negligence must be made prior to its liability under the policy being determined. Dr. Rubin maintains that, based upon the settlement of the underlying claim against him, his actual liability need not be ascertained. Under the terms of the settlement agreement, to which ICA is a party, ICA was to pay $200,000.00 to the Battistes immediately with an additional $400,000.00 to be paid if it is determined by way of this action that each diagnosis by Dr. Rubin was an "occurrence" under the terms of the policy.[3] Under the terms of the settlement agreement, the Battistes gave up their right to seek full recovery beyond the limit of the liability policy, and ICA gave up its right to force the Battistes to prove to a jury that Dr. Rubin committed malpractice. Thus, by the terms of the settlement agreement, and for purposes of settlement only, ICA impliedly conceded the issue of negligence.

ICA contends that the terms of the settlement agreement cannot be considered in this action for declaratory relief on the insurance contract. In support of this position, ICA cites well settled authority that it is improper to address new issues for the first time on appeal. *See* McKay v. City of Las Vegas, 106 Nev. 203, 789 P.2d 584 (1990); Paul v. Armstrong, 1 Nev. 70 (1865). It is true that the settlement agreement was not before the lower court as part of any pleadings; however, it is apparent that the parties had generally agreed to settle the matter for the policy limit based upon the court's interpretation of "occurrence."[4]

Although the settlement agreement was not itself part of the

---

[3]Although the settlement agreement was not signed until after summary judgment was granted, it seems apparent that the parties had already agreed in principle to settle the case for the policy limit (whatever the court determined it to be).

[4]In arguing the motions for summary judgment, ICA's counsel stated that "a motion for summary judgment in the context of this case raises not factual issues but legal issues." Counsel then went on to argue the possible interpretations of the word "occurrence" and their consequences.

pleadings below, ICA should be bound by its terms nonetheless. Since the agreement is part of the record on appeal and its authenticity is not questioned, this court can consider it in reviewing the actions of the district court. Under the terms of the agreement, ICA assents to settling the liability claim for the policy limit with the policy limit to be determined by the court's interpretation of "occurrence" as it is used in the policy. We must therefore determine the legal meaning of "occurrence."

Although this court has never before considered this issue, the general rule followed in many jurisdictions provides that an act is an "occurrence" for purposes of liability if the act "caused" the resulting injury. Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56 (3rd Cir. 1982). In applying this "cause theory," courts ask if there is "but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage." *Id.* at 61 (citations omitted). In *Appalachian,* an employer adopted certain employment policies which allegedly injured several female employees. The court held that multiple injuries of different magnitudes had but one cause, the discriminatory employment policies; therefore, there was only one "occurrence" for purposes of coverage. *Id.*

In Aetna Cas. v. Med. Protective Co. of Ft. Wayne, 575 F.Supp. 901, 903 (N.D.Ill. 1983), the court concluded that a series of injuries will be a *single* occurrence "where they all flow from a single cause." However, "[w]here each injury results from an independent cause, there are a series of 'occurrences'" *id.* at 903 (citations omitted). In *Aetna,* the court held that a physician's initial drug prescription and subsequent improper monitoring of the patient's drug usage) (resulting in blindness) constituted a single "occurrence." It was specifically found that there was only "one diagnosis and one course of treatment prescribed." Because "only one decision was made" there was but one "occurrence." *Id.*

Following *Appalachian,* the court in D'Auria v. Zurich Ins. Co., 507 A.2d 857, 860-61 (Pa.Super. 1986), held that a complaint claiming failure to diagnose and treat along with failure to "adequately follow-up" alleges only one cause and therefore only one "occurrence" for purposes of coverage. In *D'Auria,* the court concluded that it would not be appropriate to label a doctor's failure to follow-up on an original misdiagnosis *after* the patient had left the doctor's care as a separate cause of injury. *Id.* at 861.

In finding but one occurrence in a medical malpractice action, the Untied States District Court in Washington, D.C., stated that in order for subsequent acts to be considered "substantial factors" in the cause, "there must be some evidence that the doctor

did more than simply carry out a course of treatment predicated on the earlier misdiagnosis." St. Paul Fire and Marine Ins. v. Childrens Hosp., 670 F.Supp. 393, 400 (D.D.C. 1987). The District of Columbia court concluded that "[s]ubsequent acts implementing a prior negligent decision, without more, will not trigger additional insurance coverage." *Id.*

Finally, in Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme, 735 P.2d 451, 457 (Ariz. 1987), the Arizona Supreme Court applied the "cause theory" in finding that the "number of acts producing injury or damage, rather than the number of injuries caused, is the key on which the definition of 'occurrence' turns." In *Helme,* the insurance policy defined a single "occurrence" as a "series of related" acts or omissions. *Id.* at 456. Despite this somewhat narrow definition, the Arizona court concluded that two doctors' failures to diagnose were separate causes and therefore constituted two "occurrences." *Id.* at 458.

In the instant case, the only facts before the court on the "occurrence" issue are the assertions of Dr. Rubin in his affidavit. Because these assertions are uncontroverted in the record they must be accepted as fact for purposes of this appeal. Based upon Dr. Rubin's uncontroverted affidavit, we conclude that each visit and diagnosis was a separate occurrence for purposes of determining the limit of coverage under the liability policy.

Dr. Rubin examined Brandy on five separate occasions from June of 1982 to April of 1983. Generally, it seems that Brandy was suffering from similar but different symptoms on each occasion. On each occasion, Dr. Rubin made a different diagnosis and prescribed a different course of treatment. Dr. Rubin states in his affidavit that each time he treated Brandy he "made an independent assessment of her condition based on her complaints, history, and the objective results of [his] examination of her." He goes on to state that he "did not make a single diagnosis at the beginning of Brandi's [sic] course or treatment and then rely blindly on that diagnosis." Dr. Rubin finally points out that there were two significant gaps of time during his treatment of Brandy, one of nearly six months and another of nearly four months.

In the instant case, Dr. Rubin did make an independent evaluation upon each visit and different symptoms were revealed during each visit. Based upon the reevaluation we conclude that the trial court did not err under the widely accepted "cause theory," because each diagnosis was a separate "occurrence" for purposes of the insurance policy limit. Based upon this analysis, there were five separate "occurrences," each with a policy limit of $200,000.00. Therefore, under the terms of the settlement agreement, ICA is obligated to pay the aggregate policy limit of

$600,000.00 to the Battistes because there were at least three separate "occurrences."

The trial court's grant of partial summary judgment was proper because it is well settled in Nevada that when the terms of an insurance contract are unclear, they are to be construed in favor of granting coverage to the insured. The insurer is in complete control of the language of the policy, and for that reason, when there is some doubt as to the meaning of a term, it should be construed against the sophisticated insurer and in favor of the unknowing consumer. *See* Ainsworth v. Combined Ins. Co. of America, 104 Nev. 587, 763 P.2d 673 (1988); National Union Fire Ins. v. Reno's Executive Air, 100 Nev. 360, 682 P.2d 1380 (1984).

Accordingly, we affirm the orders of the district court.