**MONTANA REFINING COMPANY,**
Plaintiff,

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, Defendant.**

No. CV–N–92–845–ECR.

United States District Court,
D. Nevada.

March 20, 1996.

Michael Thornton, Thomas D. Long, Kurt Melchior, Jared E. Peterson, Alison S. Hightower, of Nossaman, Guthner and Know, San Fransisco, CA, Tobert F. Saint–Aubin of Maddox & Saint–Aubin, Reno, NV, for plaintiff.

Randall J. Peters, R. Jeff Carlisle, Stephen S. Duplantic, Nicholas R. Andrea, Stephen M. Harber, Los Angeles, CA, Alfred A. Osborne of Osborne & Gamboa, Reno, NV, for defendant.

### ORDER

EDWARD C. REED, Jr., District Judge.

The question is whether the "Hazardous Substance Remedial Action Exclusion" in a commercial general liability (CGL) insurance policy has been triggered. The answer depends on the proper construction of the exclusion, which is a matter of first impression. The exclusion is susceptible to only one reasonable construction and is therefore not ambiguous; given the undisputed facts and the terms of the exclusion, we hold that it is applicable in this case and that Montana Refining is therefore not entitled to coverage under the CGL policy.

The facts are simple and, in relevant part, not disputed. Montana Refining Company ("MRC") operates a gasoline refinery in Great Falls, Montana. A byproduct of MRC's refining process is spent phenolic caustic, which is a "hazardous substance" as that term is defined by CERCLA. In late 1984, MRC shipped slightly more than 7,000 gallons of phenolic caustic to a site near Wells, Nevada, used by a company called Poly–Carb. The chemical leaked in May 1985, contaminating soil at the site. In June 1987, after two years of investigation and analysis by the State of Nevada and the Environmental Protection Agency ("EPA"), and orders to Poly–Carb to take various actions (which apparently met with no response), EPA began an emergency removal action.

In late 1987, EPA issued Order 88–01, requiring MRC to submit plans, to be implemented upon EPA approval, for the removal of all drums containing hazardous substances

from the site, treatment of the contaminated soil, monitoring of the facility, and cleanup and final closure of the site. According to the EPA, MRC took some minor steps (e.g., removal of ten drums of phenolic caustic), but for the most part disregarded the order and did none of the work required of it. Doc. # 81, Thornton Aff. Exh. E at ¶¶ 28–31. EPA itself therefore cleaned up the site in mid–1988, undertaking the "monitoring, operation and maintenance, and other response activities connected with closure of the Site which Montana Refining was to conduct under the terms of the Order," at a total cost of over $200,000. *Id.* at ¶¶ 32–33. Costs have since mounted to over $500,000. *Id.* at ¶ 34.

EPA filed suit against Poly–Carb and MRC in August 1991, seeking to recover those costs. At all relevant times, MRC was covered by a CGL policy issued by National Union. National Union believes that the CGL policy's "Hazardous Substance Remedial Action Exclusion" (the "Remedial Action" exclusion) is applicable, and therefore refuses to defend MRC against the EPA's lawsuit or to indemnify MRC against any judgment the EPA may obtain.

Hence this lawsuit. MRC has moved for summary judgment, seeking a declaration that the exclusion does not apply and that National Union must therefore defend and indemnify it. Doc. # 81. National Union has opposed, Doc. # 84, and MRC has replied. Doc. # 91. National Union, too, has moved for summary judgment, seeking a declaration that the exclusion does apply and that it therefore need not defend or indemnify MRC. Doc. # 94. MRC has opposed, Doc. # 99, and National Union has replied. Doc. # 103.

■ The case will turn on our interpretation of the Remedial Action exclusion. The parties believe that Nevada law governs, and we agree: there appears to be no choice-of-law provision in the policy, and, as the site of the spill, Nevada has a more significant relation to the case than does any other state. *See Pioneer Chlor Alkali Co., Inc. v. National Union Fire Ins. Co.,* 863 F.Supp. 1237, 1240–41 (D.Nev.1994).

## I. Interpretation of insurance contracts in Nevada

"The question of the interpretation of a contract when facts are not disputed is a question of law." *Grand Hotel Gift Shop v. Granite State Ins. Co.,* 108 Nev. 811, 839 P.2d 599, 602 (1992). The construction and interpretation of insurance contracts in Nevada proceeds according to principles which are familiar and fairly standard. They may be sketched, roughly, as follows.

An insurance policy is a contract, "construed as written absent any ambiguity," *Farmers Ins. Exch. v. Young,* 108 Nev. 328, 832 P.2d 376, 378 (1992), and judged from the "perspective of one not trained in law or in insurance, with the terms of the contract viewed in their plain, ordinary and popular sense." *Siggelkow v. Phoenix Ins. Co.,* 109 Nev. 42, 846 P.2d 303, 304 (1993) (*citing National Union Fire Ins. Co. v. Reno's Executive Air,* 100 Nev. 360, 682 P.2d 1380, 1382 (1984) (*citing Home Indem. Co. v. Desert Palace, Inc.,* 86 Nev. 234, 468 P.2d 19, 21 (1970)))). A policy also is judged as a whole: a court must look "to the entire contract … for a true understanding of what risks are assumed by the insurer and what risks are excluded." *Reno's Executive Air,* 682 P.2d at 1383.[1] Absent some ambiguity, however, a court may not look to anything *but* the "entire contract": only if a policy is ambiguous may a court "go beyond the language and consider the intent of the parties, the subject matter of the policy, [and] the circumstances surrounding issuance." *Farmers Ins. Exch.,* 832 P.2d at 379 n. 3 (internal quotations omitted) (citations omitted).[2]

■ A policy is "ambiguous" if and only if it is susceptible to more than one *reasonable*

---

1. That is so even if the particular provision at issue appears clear. *Id.* (though an "individual clause standing alone might appear to contain no ambiguity, the policy must be read as a whole in order to give reasonable and harmonious meaning and effect to all its provisions"); *see Siggelkow,* 846 P.2d at 304 (same).

2. *See also National Union Fire Ins. Co. v. Caesars Palace Hotel & Casino,* 106 Nev. 330, 792 P.2d 1129, 1130 (1990) (*citing Reno's Executive Air,* 682 P.2d at 1383) (in case of ambiguity, "the court should consider not merely the language, but also the intent of the parties, the subject matter of the policy, [and] the circumstances surrounding its issuance").

interpretation; otherwise it is not ambiguous.[3] An unambiguous policy "will be given its plain meaning," *Farmers Ins. Exch.*, 832 P.2d at 379 n. 3: the court will not "increase an obligation to the insured where such was intentionally and unambiguously limited by the parties." *Farmers Ins. Group v. Stonik*, 110 Nev. 64, 867 P.2d 389, 391 (1994) (*citing Senteney v. Fire Ins. Exch.*, 101 Nev. 654, 707 P.2d 1149 (1985) (*citing Parsons Drilling, Inc. v. Polar Resources*, 98 Nev. 374, 649 P.2d 1360 (1982))); *see also State Farm Mut. Auto. Ins. Co. v. Cramer*, 109 Nev. 704, 857 P.2d 751, 755 (1993). Put simply, the court will not "rewrite" the terms of the contract. *Id.*

▮ In Nevada, as elsewhere, an ambiguous policy "will be construed against the insurer and in favor of the insured," *Serrett v. Kimber*, 110 Nev. 486, 874 P.2d 747 (1994).[4] In particular, "clauses excluding coverage are interpreted narrowly against the insurer," *Reno's Executive Air*, 682 P.2d at 1382 (*citing Harvey's Wagon Wheel*, 606 P.2d at 1098), and "an insurer wishing to restrict the coverage of a policy should employ language which clearly and distinctly communicates to the insured the nature of the limitation." *Id.*

▮ The rule that ambiguities are construed in favor of the insured is of limited scope, however: an ambiguous policy will be construed only "to effectuate the *reasonable* expectations of the insured." *Farmers Ins. Exch.*, 832 P.2d at 379 n. 3 (emphasis added); *see also Caesars Palace*, 792 P.2d at 1130 (an

---

**3.** This is a general principle of contract law in Nevada, *see, e.g., Margrave v. Dermody Properties, Inc.*, 110 Nev. 824, 878 P.2d 291, 293 (1994), and has been applied in the insurance context in various Nevada decisions. In *Grand Hotel*, 839 P.2d at 602 (*citing Insurance Corp. of America v. Rubin*, 107 Nev. 610, 818 P.2d 389, 392 (1991); *Keener v. California State Auto. Ass'n*, 107 Nev. 504, 814 P.2d 87, 88 (1991)) (emphasis added), "the term 'net sales'" was "susceptible to more than one interpretation because *reasonable* minds" could disagree "as to what items should be deducted from the gross earnings to determine the net sales," and was therefore ambiguous.

In *Neumann v. Standard Fire Ins. Co.*, 101 Nev. 206, 699 P.2d 101 (1985), an insurer attempted to add an anti-stacking amendment to its uninsured motorist policy. The court explained that [t]he amendment resulted in confusion rather than clarification. The amendment mislabeled and mislettered those portions of the amendment intended to correspond with the original policy. While [the insureds], through an exercise of deduction and elimination, may have been able to divine the result intended by [the insurer], such a task was certainly not required nor should be expected of them. Indeed, given the consistent misdirections of the amendment, *an insured could reasonably conclude* that the amendment did not apply to his policy. *Id.* at 104 (emphasis added).

In *Reno's Executive Air*, 682 P.2d 1380, a policy provision excluded from coverage "property that is 'owned, rented, occupied, or used' by the Named Insured, or 'in the care, custody or control' of the Named Insured," as well as property "carried in or on any aircraft [to which the policy applied]." The court held, with respect to the latter term, that, because the exclusion did not "specify in whose possession property 'carried in or on [the] aircraft' must be before the

exclusion applies," the exclusion was "susceptible to more than one *reasonable* interpretation" and was thus ambiguous. *Id.* at 1382.

And in *Harvey's Wagon Wheel, Inc. v. MacSween*, 96 Nev. 215, 606 P.2d 1095 (1980), Harvey's was insured by Fireman's Fund, and, before construction on its hotel, added two subcontractors as additional insureds "as their interests may appear." The hotel was damaged by fire allegedly caused by the subcontractors' negligence. The insurer paid Harvey's and, as subrogee, sued the subcontractors for the damages done by their negligence. An insurer cannot bring a subrogation claim against its own insured, absent an explicit proviso to the contrary in the policy. Fireman's Fund argued that the phrase "as their interests may appear" meant the subcontractors were limited insureds, covered only against loss to their own property, and open to a subrogation suit for damage to Harvey's resulting from their negligence. The Nevada Supreme Court disagreed, holding that the phrase "as their interests may appear" could *reasonably* be read to limit the insurer's liability *to* the subcontractors to the value of their lost property, but not to abrogate the immunity from subrogation liability to which they would otherwise be entitled. *Id.* 606 P.2d at 1098.

**4.** *See also Stonik*, 867 P.2d at 391; *Grand Hotel*, 839 P.2d at 602 (*citing Rubin*, 818 P.2d at 392; *Keener*, 814 P.2d at 88) ("[w]here a term in an insurance contract is unclear and ambiguous, all doubts are resolved in favor of the insured"); *Neumann*, 699 P.2d at 104 (*citing Yosemite Ins. Co. v. State Farm*, 98 Nev. 460, 653 P.2d 149 (1982)); *Harvey's Wagon Wheel*, 606 P.2d at 1098; *United Servs. Auto. Ass'n v. Crandall*, 95 Nev. 334, 594 P.2d 704, 706 (1979).

ambiguous policy "should be construed to effectuate the *reasonable* expectations of the insured") (emphasis added). Thus, a policy is not ambiguous unless it is subject to more than one reasonable interpretation, and a policy which is ambiguous will be construed only in a reasonable manner.

## II. *The Remedial Action exclusion*

■ The exclusion at issue in this case reads as follows:

### HAZARDOUS SUBSTANCE REMEDIAL ACTION EXCLUSION

This policy does not apply to the liability of the Insured, or liability of another for which the insured may be liable in whole or in part, resulting from any suit, action, proceeding or order brought or issued by or on behalf of any Federal, State or local governmental authority seeking (a) Remedial Action, or the costs thereof, (b) damages for injury to, destruction of or loss of natural resources, including the costs of assessing such injury, destruction or loss, if such suit, action, proceeding or order arises from the release of a hazardous substance at any area, whether or not owned by the insured. The company shall not have the obligation to defend any suit, action or proceeding seeking to impose such liability.

*Special Definitions*

The following definitions apply to this Exclusion:

Release means: any spilling, leaking, pumping, pouring, emitting, emptying, injecting, escaping, leaching, dumping or disposing into the environment.

Remedial Action means:

(a) the cleanup or removal of released hazardous substances from the environment; and,

(b) such actions as may be necessary to monitor, assess and evaluate the release or threat of release of hazardous substances; and,

(c) the disposal of removed material, or the taking of such other actions as may be necessary to temporarily or permanently prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

Hazardous Substance means: smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants.

### A. *MRC's suggested construction of the exclusion*

MRC's extended exegesis of the exclusion consists of two main arguments. First, it contends, the "crucial problem" with the exclusion, Doc. # 81 at 12, is that it contains no conjunction—neither an "and" nor an "or"—joining clause (a), which refers to "Remedial Action, or the costs thereof," and clause (b), which refers to natural resource damages. Instead, only a comma appears between the clauses. It is therefore unclear, MRC explains, whether the exclusion is triggered only by a suit seeking both "Remedial Action" *and* "natural resource damages," or whether a suit seeking only one—i.e., either "Remedial Action" *or* "natural resource damages"—will trigger the exclusion and bar coverage. Because the two meanings are "equally plausible," *id.,* MRC continues, the exclusion is ambiguous and must be construed in a manner that results in coverage. And the construction MRC urges is one that interprets clauses (a) and (b) as joined, implicitly, by an "and", so that the exclusion is triggered only if a suit against an insured seeks both Remedial Action *and* natural resource damages. Since the EPA's suit against it does not seek natural resource damages, MRC concludes, the exclusion has not been triggered and it is entitled to coverage under the policy.

MRC's second argument targets the exclusion's definition of "Remedial Action." That definition, set out above, contains three parts, and, because those parts are joined by the word "and", MRC argues that the actions described in each must be sought before a lawsuit can be deemed to seek "Remedial Action" within the meaning of the policy. In other words, according to MRC, a lawsuit seeks "Remedial Action" or the cost thereof, under clause (a) of the exclusion, only if it seeks "cleanup or removal" under part (a) of the "Remedial Action" definition, *and* "ac-

tions . . . to monitor, assess and evaluate" the situation under part (b) of the definition, *and* "disposal" or "other actions" under part (c). Doc. # 81 at 19. In this case, MRC explains, EPA performed, and seeks the costs of, only a cleanup at the spill site, and its activities therefore fall entirely *within* part (a) of the "Remedial Action" definition. Neither part (b) nor part (c) is satisfied, and, MRC concludes, there has thus been no "Remedial Action" within the meaning of clause (a) of the exclusion.

B. *The policy's definition of "Remedial Action"*

We disagree with MRC's parsing of the exclusion's language, and turn first to its proposed reading of the definition of "Remedial Action." The definition, to repeat, reads as follows:

Remedial Action means:

(a) the cleanup or removal of released hazardous substances from the environment; and,

(b) such actions as may be necessary to monitor, assess and evaluate the release or threat of release of hazardous substances; and

(c) the disposal of removed material, or the taking of such other actions as may be necessary to temporarily or permanently prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

Again, MRC suggests that, because parts (a), (b) and (c) of the definition are linked by the conjunction "and", there has been "Remedial Action," as the term is defined in the exclusion, only if the actions described by parts (a) *and* (b) *and* (c) have been taken.

That is not persuasive. First, both part (b) and part (c) of the definition contain the phrase "as may be necessary." Consider, then, a case in which a "governmental authority" seeks to compel, or to recover the cost of, a "cleanup or removal" of hazardous substances under part (a), but determines that no "actions" to "monitor, assess and evaluate" the situation are "necessary" under part (b), and, further, that no "other actions" to "prevent, minimize or mitigate damages"

are "necessary" under part (c), and therefore does not seek to compel, or to recover the costs of, the "actions" described in parts (b) and (c). Under MRC's reading of the definition, the suit does not involve "Remedial Action," because only part (a) of the definition is satisfied.

The exclusion, however, clearly contemplates cases in which no "action" at all under part (b) or part (c) is deemed "necessary," and in which no such "action" is taken, but which will nevertheless involve "Remedial Action" because the governmental authority bringing the suit seeks to compel, or to recover the cost of, a "cleanup or removal" under part (a). Otherwise there would have been no reason to use the phrase "as may be necessary" in parts (b) and (c). MRC's argument is thus unpersuasive: by requiring that the "actions" described in parts (b) and (c) be taken, or sought, before a lawsuit can involve "Remedial Action," and by eliminating the possibility that there may be cases in which such "actions" are not deemed "necessary," but which do involve "Remedial Action" because they involve "cleanup or removal" under part (a), MRC's reading of the definition renders meaningless the presence in parts (b) and (c) of the phrase "as may be necessary."

There is a second problem with MRC's reading of the "Remedial Action" exclusion. It places too much emphasis on the fact that the three parts of the definition are linked by the word "and". The reasoning of the Texas court of appeals in *Aerospatiale Helicopter Corp. v. Universal Health Servs., Inc.,* 778 S.W.2d 492 (Tex.Ct.App.1989), is illustrative. Aerospatiale sought indemnity from its insurer, Universal, for liability arising out of a helicopter accident. Universal argued that the

accident in question is not covered because of certain wording in the indemnity agreement itself. The agreement in this case provides for indemnification for basically all expenses and losses arising on account of:

(i) the use or operation of the helicopter . . . and (ii) the installation or removal of any unit of equipment pursuant to any provisions of this lease. . . .

Universal places special emphasis on the fact that these two subsections are joined by the word "and." Thus, they argue, to establish that the underlying claims fell within the scope of the indemnity clause, Aerospatiale was required to prove that the claims satisfied both subsections. Therefore, since there is no evidence in the record that the underlying claim made against Aerospatiale was based in any way on the installation or removal of any unit of equipment pursuant to a provision of the lease, Aerospatiale's claim for indemnity falls outside the scope of the indemnity provision. We disagree.

. . . .

... One of the recognized uses of "and" is to refer to "either or both" of two alternatives, when "or" might be interpreted as referring to only one or the other. A common sense reading of the indemnity agreement is that Universal agreed to indemnify Aerospatiale for liability arising from two separate circumstances ...: use and operation of the helicopter, and alteration of the helicopter. We hold that the accident in question is covered within the scope of the indemnity agreement....

*Aerospatiale*, 778 S.W.2d at 501–02 (emphasis added).[5] So too here.

Finally, and more generally, the problem with MRC's reading of the "Remedial Action" definition is this: the definition provides that "Remedial Action" "means" (a) "and" (b) "and" (c); MRC therefore reasons that "Remedial Action" has occurred only if the actions described in part (a) *and* part (b) *and* part (c) have occurred. But that is not so. The definition "x means a and b and c" does not imply the proposition "x is the case only if a and b and c." Instead, we think that the common sense reading of the definition is that "Remedial Action" is involved if the underlying lawsuit seeks to compel, or to recover the costs of, "cleanup or removal" under part (a), or the "actions" described in part (b), or the "disposal" or "actions" described in part (c), or any combination thereof.

### C. *MRC's interpretation of the body of the exclusion*

■ We turn to the body of the exclusion itself. As set out above, it applies to suits by governmental authorities seeking "(a) Remedial Action, or the costs thereof, (b) damages for injury to, destruction of or loss of natural resources, including the costs of assessing such injury, destruction or loss...." Clauses (a) and (b) are joined only by a comma, and, to reiterate, MRC argues that we should read them as being joined by an implicit "and", so that the exclusion is triggered only if a suit against an insured seeks both Remedial Action *and* natural resource damages. EPA alleges that it carried out the provisions of Order 88–01 after MRC failed to do so, by removing drums of phenolic caustic from the site, monitoring the facility, implementing some sort of "treatment process" for the soil, and closing the site, and its complaint, *see* Doc. # 81, Thornton Aff.Exh. E at ¶¶ 29–33, seeks to recover only the costs incurred in connection with those activities. Whatever costs EPA does seek, MRC concludes, the fact remains that it does not seek damages for injury to natural resources, and the exclusion therefore does not apply.

Clauses (a) and (b) of the exclusion can be read as being joined, implicitly, by an "or", or, as MRC argues is proper, an "and". Each alternative is grammatically possible, but clearly they are not equally plausible. Consider the practical consequences. If clauses (a) and (b) were joined by an "and", the exclusion would be triggered only if a plaintiff sought each and every remedy described in the exclusion, but not otherwise. EPA could, for example, conduct removal actions and remedial actions of any scope, and incur unlimited response costs; MRC would be covered so long as EPA did not also seek damages for injury to natural resources.

---

**5.** *Cf. Fredricks v. City of Las Vegas*, 76 Nev. 418, 356 P.2d 639, 641 (1960) (a contractual provision contained two clauses separated by the word "or," and the court interpreted the word in its ordinary sense, but noted that "the word 'or' may be used, interpreted, or construed in a conjunctive rather than a disjunctive sense to prevent an absurd or unreasonable result, or where the context requires such construction, or such construction is necessitated by some impelling reason in the context").

Then again, under MRC's reading, EPA could seek natural resource damages in any amount, and MRC would be entitled to coverage so long as EPA did not also seek to compel (or to recover the costs of) a "cleanup or removal" of hazardous substances under part (a) of the "Remedial Action" definition *and* "actions" to "monitor, assess and evaluate" the situation under part (b) of the definition *and* "other actions" to "prevent, minimize or mitigate damages" under part (c).

Could any policyholder, before a dispute arises, really believe, let alone reasonably believe, that this is what the exclusion means? We think not. The common sense reading of the exclusion is that, when a hazardous substance has been released, there is no coverage if a government sues for natural resource damages, or for "Remedial Action" (which, as explained above, is reasonably interpreted as meaning any or all of the actions which define that term), or for both. Under MRC's interpretation, the exclusion would apply only if the governmental authority bringing the suit sought each and every remedy described in the exclusion, and not other-wise. That interpretation is, as we have said, grammatically possible, but it is the sort of tortured reading, seizing upon a minor grammatical quibble and running counter to both common sense and the obvious sense of the contractual language, put forward only by parties in litigation. It is not an objectively reasonable reading of the exclusion.[6]

### III. *Summary*

 Coverage, as the parties correctly note, is determined by the allegations in EPA's complaint against MRC, whether or not they are ultimately proved. In its complaint, EPA seeks its costs incurred in removing the phenolic caustic, monitoring the site, performing soil treatment, and finally closing the site. Each of those activities falls within the exclusion's definition of "Remedial Action."[7] EPA is thus seeking to recover the costs of a "Remedial Action," as that term is defined in the exclusion, and, though the suit does not seek natural resource damages, the exclusion therefore applies and bars coverage.[8]

6. We are aware of only one decision dealing with the sort of grammatical oddity presented here. In *Georgia Int'l Life Ins. Co. v. Bear's Den, Inc.*, 162 Ga.App. 833, 292 S.E.2d 502 (1982), a life insurance application stated that if a premium was not paid with the application, "no insurance shall become effective unless a policy is issued and delivered to the Owner, the first premium is paid *while the facts concerning the insurability* of the lives insured are the same as described herein...." The question was whether the comma should be construed as an "and" or an "or". The court held the provision inherently ambiguous and construed the comma, favorably to the insured, as an "or"—but only because each of the variations resulting from insertion of the word "or" in place of the comma was "viable" under Georgia's substantive law. In this case, by contrast, the alternative constructions are not equally viable: one leads to a clearly unreasonable result.

7. MRC discusses at length the meaning of "remedial action" as that term is used at § 9607(a)(4)(A) of CERCLA, and argues, *see* Doc. # 81 at 18, *that the exclusion does not apply* because the EPA did not perform, and does not seek to recover the costs of, a "remedial action" at the Poly–Carb site. That misses the point. The question is not whether a "remedial action," as that term is defined in CERCLA, is involved, but whether the EPA seeks to recover the costs of a "Remedial Action"—note the capital letters—as the latter term is defined *in the policy*. That

definition includes, but goes far beyond, actions that would constitute "remedial action" under CERCLA.

8. Two other matters should be addressed. First, MRC, relying on the "regulatory estoppel" doctrine as set out in *Morton Int'l, Inc. v. General Accident Ins. Co.*, 134 N.J. 1, 629 A.2d 831 (1993), argues that National Union should be estopped from denying coverage because of certain representations it made to the Nevada regulatory authorities when it put the "Hazardous Substance Remedial Action Exclusion" into place. It suffices to say that, while the topic has not been addressed by the Nevada Supreme Court, it has been rejected by other courts, *see, e.g., Federated Mut. Ins. Co. v. Botkin Grain Co.*, 64 F.3d 537 (10th Cir.1995) (Kansas law); *cf. Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 610 N.E.2d 912, 916 n. 7 (1993) (refusing to consider the drafting history of the pollution exclusion), and would likely meet with a dim reception in Nevada, in light of this state's rule that a contract is ambiguous only if it is subject to more than one reasonable interpretation, and that an unambiguous contract is not properly construed by resort to extrinsic evidence, *Margrave v. Dermody Properties, Inc.*, 110 Nev. 824, 878 P.2d 291, 293 (1994), of which drafting or regulatory history is but one sort. Moreover, the Nevada Supreme Court has rejected an insurance company's attempt to rely on documents other than the policy in deciding the scope of coverage, and

IT IS THEREFORE HEREBY OR-DERED that Montana Refining's **motion** (**Doc. # 81**) for partial summary judgment is **DENIED.**

IT IS FURTHER ORDERED that National Union's **motion** (**Doc. # 94**) is **GRANTED.**

IT IS FURTHER ORDERED that the parties' various **requests for judicial notice** and **motions to strike** (**Docs. # 85, # 95, # 101**) are **MOOT** and **no further court action** is required with respect to them.

The **clerk** shall enter judgment accordingly.

presumably would take the same view of an attempt by an insured to rely on such extrinsic matter. *See Allstate Ins. Co. v. Maglish,* 94 Nev. 699, 586 P.2d 313, 316 (1978) ("sound judicial policy favors determining an insured's rights from the face of the policy or documents which form part of the bargain").

Second, National Union has moved for summary judgment with respect to another, entirely separate CGL policy (the "1984 policy") which it issued to MRC. The coverage provided by that policy ended on April 1, 1985. MRC makes a brief and halfhearted argument, *see* Doc. # 99 at 19, that it is covered under the 1984 policy, but that is clearly not so: the policy, *see* Doc. # 94 Exh. 9, provided coverage for property damage from "occurrences," and the relevant "occurrence" in this case was a chemical spill which occurred in May 1985, more than a month after coverage lapsed under the 1984 policy.