No. 82,463

MICHAEL R. WILSON, *Appellant,* v. AUGUSTO RAMIREZ, M.D., Defendant, and KANSAS MEDICAL MUTUAL INSURANCE COMPANY AND KANSAS HEALTH CARE STABILIZATION FUND, *Appellees.*

(2 P.3d 778)

Opinion filed June 2, 2000.

*Carlton W. Kennard,* of Spigarelli, McLane & Short, of Pittsburg, argued the cause, and *Fred Spigarelli,* of the same firm, was with him on the brief for appellant.

*Wayne T. Stratton,* of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, argued the cause, and *Anne M. Kindling,* of the same firm, was with him on the brief for appellees Kansas Medical Mutual Insurance Company and Kansas Health Care Stabilization Fund.

The opinion of the court was delivered by

SIX, J.: This declaratory judgment action questions the amount of insurance coverage available to insure Dr. Augusto Ramirez for professional negligence. The insurance providers are defendants Kansas Medical Mutual Insurance Company (KaMMCO) and the Kansas Health Care Stabilization Fund (the Fund). The case arises out of the medical treatment of plaintiff Michael R. Wilson. In an underlying failure to diagnose/loss of chance of survival medical malpractice action, Wilson claims five separate and distinct injuries over approximately a 21-month period. Wilson alleges his injuries result from five separate and distinct negligent acts of Ramirez. Wilson asserts each act (episode of treatment) gives rise to separate policy coverage under the KaMMCO policy and the Fund. KaMMCO and the Fund contend only $300,000 (one policy limit of coverage from each) is available. The district court agreed with defendants and granted summary judgment. Wilson appeals.

Our jurisdiction is under K.S.A. 20-3017. (A motion to transfer to this court was granted.)

The question is whether the district court was correct in holding that only one policy limit of coverage applied to Wilson's loss of chance of survival claim.

Finding no error, we affirm.

## FACTS

The facts are not in dispute. In the summer of 1992, Wilson noticed a "peeling spot" or lesion on his lower lip. The lesion recurred every few weeks for several months. He sought treatment from Ramirez in October 1992. Ramirez performed an excision, removing the lesion. The excised tissue was sent to pathology to determine if it was cancerous. The pathology report showed no cancer. Wilson contends the specimen sent to pathology did not include the epithelial membrane and was therefore insufficient for

a complete analysis. Wilson also contends Ramirez did not read the pathology report (the first claimed act of malpractice).

In the summer of 1993, Wilson again noticed a lesion on his lip. Ramirez performed a second excision in December 1993. Based on the first pathology report, Ramirez concluded the recurrence was not cancer. Ramirez did not send the excised tissue to pathology (the second claimed act of malpractice).

Wilson returned to Ramirez in March 1994 complaining of another lesion. The diagnosis was "granulomas" (a reaction to the stitches from the prior excision). The granulomas were in the same area of the left lower lip, but not the exact location of the prior lesion. Ramirez again excised the lesion and did not send the tissue to pathology for analysis (the third claimed act of malpractice).

Eight days later Wilson returned to Ramirez complaining that the incision had not healed. Ramirez diagnosed a cyst and cauterized it with silver nitrate. (The fourth claimed act of malpractice.)

Wilson was examined by Ramirez in May 1994 to recheck the cauterization. Ramirez again diagnosed a cyst and removed it, assuring Wilson the cyst was benign with a high tendency to recur. (The fifth claimed act of malpractice.)

Wilson continued to experience numbness and lesions on his lower lip. In November 1994, he saw a maxillofacial surgeon who diagnosed the lesion as malignant. A biopsy confirmed the surgeon's diagnosis.

Ramirez carries medical liability insurance with KaMMCO. The KaMMCO policy provides limits of $200,000 per claim, with a $600,000 annual aggregate limit. Ramirez also has statutory coverage through the Fund. The Fund coverage selected by Ramirez was $100,000 per judgment or settlement, with a $300,000 per fiscal year limit. Physicians may choose higher Fund coverage. See K.S.A. 40-3403(e). Ramirez selected the lowest amount available.

Wilson sued Ramirez for loss of chance of survival, alleging five separate acts of malpractice. (Ramirez contends he relied on the initial pathology report in concluding each time that the lesions were not cancerous.) This underlying action is pending. This declaratory judgment action questions the amount of coverage available from KaMMCO and the Fund. The parties reached a partial

settlement. (KaMMCO paid $200,000, the Fund $100,000.) The $300,000 paid is the maximum amount available according to KaMMCO, the Fund, and the district court. The Court of Appeals issued a show cause order questioning whether Wilson's appeal should be retained in light of the settlement. The parties explained that there exists a genuine dispute about the availability of additional coverage under the respective policies.

## DISCUSSION

This summary judgment case presents an issue of statutory interpretation. Our standard of review in summary judgment cases is well known. See *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 (1999).

Medical malpractice insurance must conform with statutory requirements. If policy language conflicts with statutory requirements, the policy is rewritten by operation of the statute. See *Bell v. Simon*, 246 Kan. 473, Syl. ¶ 2, 790 P.2d 925 (1990). K.S.A. 40-3402(a) says that a medical malpractice policy may not be "less than $200,000 *per occurrence*, subject to not less than a $600,000 annual aggregate for all claims made." (Emphasis added.) Wilson argues that the KaMMCO policy does not conform to K.S.A. 40-3402(a) because the Ramirez policy limits coverage to $200,000 *per claim*. Wilson alleges there were five separate occurrences of malpractice; thus, he has a $1,000,000 claim and is entitled to the full $600,000 KaMMCO policy limit. The critical language for examination, according to Wilson, is "per occurrence" in K.S.A. 40-3402(a). We next consider the district court's resolution of Wilson's "per occurrence" argument.

### The District Court's Opinion

The district court resolved the coverage dispute by concluding in part:

"II. Primary Coverage.

. . . .

"4. In interpreting the scope of requisite coverage under K.S.A. 1996 Supp. 40-3402(a), the intent of the legislature governs if that intent can be ascertained. This is a fundamental rule of statutory construction. See *City of Wichita v. 200 South Broadway*, 253 Kan. 434, 436, 844 P.2d 956 (1993).

" 'In order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of an act, but are required to consider and construe together all parts thereof in pari materia. When the interpretation of some one section of an act according to the exact and literal import of its words would contravene the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason, disregarding so far as may be necessary the strict letter of the law.' *Kansas Commission on Civil Rights v. Howard*, 218 Kan. 248, Syl. ¶ 2, 544 P.2d 791 (1975).' *Todd v. Kelly*, 251 Kan. at 516 (emphasis added by *Todd* omitted).

"In construing the various sections of the Health Care Provider Insurance Availability Act (the Act), 'the entire Act must be considered and . . . no one section should be read in isolation from the others.' The citation is *Todd v. Kelly*, 251 Kan. at 516, 517.

"5. The various provisions of the Act, read in pari materia, reflect that only one policy limit is available here.

"6. K.S.A. 40-3408 establishes the limit of an insurer's liability: The insurer, *e.g.*, KaMMCO, 'shall be liable only for the first $200,000 of a claim for personal injury or death arising out of the rendering of or the failure to render professional services by such health care provider.' KaMMCO's policy provides coverage consistent with these limits. Therefore, consistent with K.S.A. 40-3408, KaMMCO's liability in this case is limited to 'the first $200,000 of [Plaintiff's] claim for personal injury.'

"7. Furthermore, K.S.A. 1996 Supp. 40-3402(a) itself uses the terms 'per occurrence' and 'claim' interchangeably by setting a limit 'per occurrence' but an annual aggregate limit per 'claim.'

"8. The legislative history of the Act is also instructive as to the intent of the legislature and the extent of coverage mandated by the Act.

"9. What is now K.S.A. 1996 Supp. 40-3402(a) was originally recommended by a special committee appointed in 1975 to study the medical malpractice insurance crisis. During special committee hearings, Fletcher Bell, then Commissioner of Insurance, submitted a specimen claims-made policy as an example in explaining the shift from occurrence-based insurance to claims-made insurance.

"10. The specimen policy provided by Commissioner Bell obligated the insurer to pay on behalf of the Insured 'all sums which the Insured shall become legally obligated to pay as damages because of any claim or claims made against the Insured during the policy period arising out of the performance of professional services rendered or which should have been rendered.' Dr. Ramirez's KaMMCO policy contains language identical to the language in the sample claims-made policy which Commissioner Bell submitted to the legislature.

"11. The specimen claims-made policy submitted to the legislative special committee by Commissioner Bell stated: 'The limit of liability stated in the Declarations as applicable to 'each claim' is the limit of the Company's liability for loss resulting from any one claim or suit or all claims or suits first made during the policy period because of injury to or death of any one person.' Dr. Ramirez's

KaMMCO policy contains language identical to the language used in the sample policy submitted by Commissioner Bell.

"12. Therefore, the KaMMCO policy at issue here provides coverage identical to the coverage provided under the sample claims-made policy upon which the legislature based what is now K.S.A. 1996 Supp. 40-3402(a).

. . . .

"14. K.S.A. 40-3402(a) requires that each health care provider have a professional liability policy which has been 'approved by the commissioner.' The KaMMCO policy issued to Dr. Ramirez was approved by the Insurance Commissioner.

"15. The KaMMCO policy issued to Dr. Ramirez is consistent with the statutory coverage mandated by the Health Care Provider Insurance Availability Act. The KaMMCO policy is identical to the sample claims-made policy upon which the statutory scheme was based. Additionally, the policy is consistent with the intent of the legislature as derived from reading all provisions of the Act together.

"16. Contrary to Plaintiff's assertions, the legislature's use of the word 'occurrence' one time in the statutory scheme and the KaMMCO policy's failure to use the same term does not render the KaMMCO policy ineffective or inconsistent with the statutorily mandated insurance coverage."

## Analysis

We do not consider Wilson's focus on the term "per occurrence" a primary KaMMCO coverage issue. This case does not present questions of "occurrence-based" versus "claims-based" coverage. Kansas mandates claims-based coverage. See *Missouri Medical Ins. Co. v. Wong*, 234 Kan. 811, Syl. ¶ 3, 676 P.2d 113 (1984). The K.S.A. 40-3402(a) "per occurrence" language does not alter Kansas' claims-based insurance coverage structure. What Wilson is really arguing is that he has five separate "claims." Wilson asserts he suffered separate and distinct injuries because of each of the five alleged negligent acts of Ramirez. Testimony from his experts, he argues, shows that his chances of surviving 5 years dwindled 5 to 10 percent with each treatment and Ramirez' subsequent failure to diagnose cancer. Wilson reasons that he has separate distinct claims for each occurrence because there was: (1) a duty to treat him within a reasonable standard of care, (2) a breach of that duty, and (3) injury resulting from the breach of the duty.

The petition in the underlying malpractice case alleges five counts, one for each act of negligence (the five acts are detailed in the Facts section of this opinion). Applying Wilson's argument, his

chance for survival would reflect: Count 1, 95% to 90% (October 1992); Count 2, 90% to 80% (December 1993); Count 3, 85% to 70% (March 1994); Count 4, 80% to 60% (April 1994); Count 5, 75% to 50% (May 1994).

The key question is whether, under the facts here, the five acts of treating and failing to diagnose cancer constitute five "claims" or "occurrences" of malpractice for coverage purposes. We view the K.S.A. 40-3402(a) language as "$200,000 *per claim*" instead of "$200,000 *per occurrence*" because (1) the word "claim" is used interchangeably with the word "occurrence," (see K.S.A. 40-3408, providing: "The insurer . . . shall be liable only for the first $200,000 of a claim for personal injury or death") and (2) the legislature has clarified 40-3402(a) by replacing "occurrence" with "claim." L. 1997, ch. 134, § 1. "Claim" is not defined in either the KaMMCO policy or in K.S.A. 40-3408.

The question here appears to be one of first impression for Kansas. The parties look to other jurisdictions for supporting authority. We first review and distinguish the cases relied upon by Wilson.

In *Insurance Corp. of America v. Rubin*, 107 Nev. 610, 818 P.2d 389 (1991), the court discussed the meaning of "occurrence" in a policy with a limit of $200,000 per occurrence of malpractice. The alleged acts of malpractice were Rubin's repeated failures to diagnose a brain tumor in a young girl (Brandy). Rubin saw Brandy five times over the course of 1 year. Rubin made an independent assessment of Brandy's condition each time he saw her. As the opinion observed, he said he did not make a single diagnosis and rely blindly on that diagnosis. The *Rubin* court adopted a "cause theory" (whether there is but one proximate uninterrupted and continuing cause resulting in all of the injuries and damages): Each visit was a separate occurrence because Rubin made a different diagnosis and prescribed a different course of treatment. 107 Nev. at 615.

*Wiltshire v. Government of Virgin Islands*, 893 F.2d 629 (3rd Cir. 1990), involved the treatment of a premature infant. The alleged acts of malpractice were: (1) negligent placement of a feeding tube, (2) negligent cardiopulmonary resuscitation or "bagging" and (3) negligent placement of an IV line in the infant's forehead. The

infant: (1) contracted an infection from the feeding tube being in place too long, (2) stopped breathing for a period of time (and later had less than normal mental, motor, and speech development), and (3) sustained a disfiguring scar on her forehead and face from a feeding line in her scalp.

The *Wiltshire* court also looked to the "cause theory." Three separate and distinct acts or causes of malpractice were found. Thus, the infant's injuries were not an "injury arising out of continuous or repeated exposure to substantially the same conditions" (which was the statutory definition of "occurrence"). 893 F.2d at 634.

*Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme,* 153 Ariz. 129, 134, 735 P.2d 451 (1987), determined the meaning of "occurrence" when the policy defined "occurrence" as "any incident, act or omission, or series of related incidents, acts or omissions resulting in injury." The alleged acts of malpractice involved two separate doctors who failed to examine x-rays revealing a fracture of the spine, which fracture later caused spinal cord damage and death. *Ariz. Prop.* held that the number of acts producing the injury or damage rather than the number of injuries caused is the key to the definition of "occurrence." Two occurrences or claims were established under plaintiff's policy because the two doctors' omissions were unrelated separate causal acts of malpractice. 153 Ariz. at 135-36.

*Colbert County Hosp. Bd. v. Bellefonte Ins. Co.,* 725 F.2d 651 (11th Cir. 1984), defined the meaning of "claim" where the policy did not define it. The alleged acts of malpractice in *Colbert* were three separate operations for fat removal on three separate days and on three different parts of a woman's body. Each operation left "very prominent, noticeable scars" (a long scar across her abdomen, a scar from her left shoulder blade to her left hip, and a scar from her shoulder blade to her hip on the right side). 725 F.2d at 652. *Colbert* held the woman had three "claims." 725 F.2d at 654. The *Colbert* court reasoned the word "claim" was used in the disjunctive with the word "suit"; thus, "claim" did not mean "suit." In addition, the woman could have filed three separate lawsuits.

The procedural preference to consolidate lawsuits was not decisive. Each operation would place liability on the hospital.

Wilson also cites *Doe v. Ill. State Med. Inter-Ins. Exchange*, 234 Ill. App. 3d 129, 599 N.E.2d 983 (1992). The *Doe* court decided that a physician's mistreatment of diabetes spanning the effective dates of two malpractice policies was not one "claim" under the first policy due to continuous and related acts of negligence. The patient displayed symptoms of diabetes, and the doctor failed to check the patient's blood sugar levels. The doctor later prescribed a drug that should not be prescribed for a person with diabetes. The patient became severely ill and was hospitalized. Through many operations, the patient lost internal organs and developed HIV from blood transfusions. *Doe* held: "It is the causative events producing the damage that constitute actionable conduct, not the number of injuries." 234 Ill. App. 3d at 140. The *Doe* court concluded the patient had three claims: two claims under the first policy and one claim under the second policy, for three separate acts of negligence.

The five cases relied upon by Wilson are distinguishable from the facts here. Ramirez made a single diagnosis at the beginning of Wilson's treatment and continued to rely on that diagnosis.

We now review cases with a closer factual association with Wilson's case.

*Aetna Cas. v. Med. Protective Co. of Fort Wayne*, 575 F. Supp. 901, 903 (N.D. Ill. 1983), held that a physician's initial drug prescription, six refills of the prescription, and improper monitoring of usage was a single "occurrence." There was only one diagnosis and course of treatment. All subsequent acts merely implemented the prior decision as to the course of treatment.

In *St. Paul Fire & Marine Ins. Co. v. Children's Hospital*, 670 F. Supp. 393 (D.D. Cir. 1987), the physician's repeated failure to diagnose a cervical cord tumor did not trigger multiple insurance coverages. Conduct following an initial diagnosis must be an additional cause of injury, or substantial factor in resulting injury, for multiple coverage to exist. 670 F. Supp. at 400. The physician's repeated failure to diagnose was one continuing harm, not additional causes of injury. There must be some evidence that the doc-

tor did more than simply carry out a course of treatment predicated on the earlier misdiagnosis to activate multiple episode coverage.

*Auber v. Jellen*, 196 W.Va. 168, 469 S.E.2d 104 (1996), involved a series of five examinations and diagnoses over a 20-month period where the physician failed to diagnose rectal cancer. *Auber* held the repeated failure to diagnose constituted only one occurrence or claim. 196 W.Va. at 170.

Finally, in *D'Auria v. Zurich Ins. Co.*, 352 Pa. Super. 231, 507 A.2d 857 (1986), the physician's failure to diagnose, treat, and follow up was also held to be one occurrence under an occurrence-based policy.

Our examination of each of these cases leads us to conclude the district court's analysis was correct:

"Plaintiff's best chance for survival would have been a diagnosis of the cancer at the time of the original excision in October, 1992 (assuming it was present at that time). Plaintiff's worst chance for long-term survival is at the time the cancer was actually diagnosed, in November, 1994. Therefore, Plaintiff's greatest lost chance of survival was from the original alleged misdiagnosis to the actual diagnosis. He suffered no additional injuries from each diminishing loss of chance of survival with each subsequent alleged failure to diagnose. There was only one injury."

Here, Ramirez said he continued to rely on the initial pathology report and treated Wilson on that basis. He said in his deposition, "[A]ll along I was thinking that this was a benign lesion." Ramirez did diagnose the benign lesion as different things (granuloma and cyst), but overall the record is clear that he believed he was treating problems related to one benign condition.

This result is consistent with each of the failure to diagnose cases. *Rubin, St. Paul, Auber*, and *D'Auria* all seem to agree that one diagnosis and the continuing course of treatment relying on that diagnosis are one occurrence or claim. As the *St. Paul* court held: "A misdiagnosis or 'failure-to-diagnose' malpractice case is distinctive because the claimant was already suffering the disease at the time he sought treatment." 670 F. Supp. at 399. We agree.

The district court's analysis here is also consistent with the "cause theory" adopted by a majority of the cases we have discussed. The cause theory asks if there was but one proximate, uninterrupted, and continuing cause that resulted in all of the injuries

and damages. See, *e.g., Wiltshire,* 893 F.2d at 634; *Ariz. Prop.,* 153 Ariz. at 135-136; *D'Auria,* 352 Pa. Super. at 236-37. We agree with the application of the "cause" theory to the facts of this case. Here, the cause of Wilson's injury was failure to diagnose. Ramirez continually failed to diagnose. He continued to rely on the first pathology report and did not send subsequent samples to pathology. Under the facts here, there was only one cause of Wilson's injuries, and thus, one claim or occurrence for purposes of coverage. Under Wilson's theory in his malpractice action, his best chance for survival would have resulted from a diagnosis of cancer in October 1992, at the time of the original treatment.

We also agree with the district court's analysis with respect to Fund coverage. The district court reasoned:

"III. Fund Coverage.

"17. K.S.A. 1996 Supp. 40-3403 establishes the Kansas Health Care Stabilization Fund to provide additional statutory liability coverage for physicians beyond the coverage provided by their primary insurer.

"18. The Fund is liable to pay '[a]ny amount due from a judgment or settlement which is in excess of the basic coverage liability of all liable resident health care providers or resident self-insurer's for any personal injury or death arising out of the rendering of or the failure to render professional services.' K.S.A. 1996 Supp. 40-3403(c) (1).

"19. Pursuant to K.S.A. 1996 Supp. 40-3403(c) (1), each health care provider shall make an election of the amount of Fund coverage, which limits the liability of the Fund 'with respect to judgments or settlements relating to injury or death arising out of the rendering of or failure to render professional services.'

"20. The statutes governing the liability of the Fund speak only in terms of 'judgments' and 'settlements' and they do not mention the terms 'occurrence' or 'claim.'

"21. The extent of Fund coverage selected by Dr. Ramirez provided for a liability limit of $100,000 per judgment or settlement.

"22. In the medical malpractice action underlying this declaratory judgment case, there will be but one judgment or settlement.

"23. Therefore, the Fund coverage for the underlying malpractice action is limited to $100,000."

Affirmed.

McFARLAND, C.J., not participating.

RICHARD W. WAHL, Senior Judge, assigned.[1]

---

[1] **REPORTER'S NOTE:** Judge Wahl was appointed to hear case No. 82,463 vice Chief Justice McFarland pursuant to the authority vested in the Supreme Court by K.S.A. 20-2616.