No. 98,181

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, *Plaintiff,*
v. STACY WILKINS, *et al., Defendants.*
(179 P.3d 1104)

Opinion filed March 28, 2008.

*Brian R. Collignon,* of Fleeson, Gooing, Coulson & Kitch, LLC, of Wichita, argued the cause, and *Lyndon W. Vix,* of the same firm, was with him on the brief for the plaintiff American Family Mutual Insurance Company.

*John R. Weist,* of Long, Luder & Gordon, P.A., of Overland Park, argued the cause, and *Paul Hasty, Jr.,* of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Overland Park, was on the brief for defendant Allstate Indemnity Company.

*Arthur S. Chalmers,* of Hite, Fanning & Honeyman, LLP, of Wichita, argued the cause, and *Rodney M. Confer,* of Knudsen, Berkheimer, Ichardson & Endacott, LLP, of Lincoln, Nebraska, and *Pamela J. Thompson,* of Law Office of Pamela J. Thompson, of Wichita, *Sean C. Brennan,* of Accident Recovery Team, P.A., of Wichita, *Jim Lawing,* of Wichita, *Keith D. Richey,* of Wichita, and *Stephen M. Kerwick,* of Foulston Siefkin, LLP, of Wichita, were with him on the brief for the other defendants.

The opinion of the court was delivered by

ROSEN, J.: This case presents four certified questions from the United States District Court for the District of Kansas regarding the liability limits of an automobile insurance policy. The four certified questions are as follows:

1. WHEN "OCCURRENCE" IS NOT DEFINED IN AN AUTOMOBILE LIABILITY POLICY, WHAT TEST SHOULD BE APPLIED UNDER KANSAS LAW IN DETERMINING WHETHER THERE ARE

MULTIPLE "OCCURRENCES" AND, IF SO, THE NUMBER OF "OCCURRENCES"?

2. WHEN MULTIPLE COLLISIONS INVOLVING SEVERAL VEHICLES AND INJURED PERSONS RESULT FROM THE ACTIONS OF THE INSURED DRIVER, IS EACH COLLISION AN "OCCURRENCE"?

3. IF THE ANSWER TO QUESTION NUMBER IS "YES," HOW MANY OCCURRENCES WERE THERE UNDER THE FACTS? AND

4. WHAT IS THE MAXIMUM AMOUNT OF AMERICAN FAMILY'S LIABILITY UNDER THE POLICY?

## UNDISPUTED FACTS

The undisputed facts as set forth by the federal district court are as follows:

"Plaintiff American Family Mutual Insurance Company ('American Family') issued an automobile policy to Laverne Roy, effective February 23, 2005 to April 11, 2005. The policy contained a per person limit of $100,000 and a per occurrence limit of $300,000. The policy contained the following section:

"LIMITS OF LIABILITY

"The limits of liability shown in the declarations apply, subject to the following:

"1. The bodily injury liability limit for 'each person' is the maximum for all damages sustained by all persons as a result of bodily injury to one person in any one occurrence.

"2. Subject to the bodily injury liability limit for 'each person,' the bodily injury liability limit for 'each occurrence' is the maximum for bodily injury sustained by two or more persons in any one occurrence.

"3. The property damage liability limit for 'each occurrence' is the maximum for all damages to all property in any one occurrence.

"We will pay no more than these maximums no matter how many vehicles are described in the declarations, or insured persons, claims, claimants, policies or vehicles are involved.

"The policy does not contain a definition of the word 'occurrence.'

"On April 4, 2005, Laverne A. Roy was driving a 2003 Ford F350 in a southbound direction in the northbound lanes of Interstate 35, near the south Wichita Turnpike Interchange in Sedgwick County, Kansas. Rebecca A. Jones was driving a 2005 Honda Civic in a northbound direction in the northbound lanes of Interstate 35 near the south Wichita Turnpike Interchange in Sedgwick County. At milepost 38.3, at 1:38 p.m., Jones swerved to avoid Roy's vehicle and overturned her Honda. Jones claims she was injured as a result and is entitled to damages in excess of $75,000. Defendant State Farm Automobile Insurance Company provided automobile liability insurance to Jones

and asserts a subrogation claim of $5,000 for personal injury protection benefits paid on behalf of Jones.

"Carlton W. Wolf, Jr., driving a 1985 Mercedes, was also traveling in a northbound direction in the northbound lanes of Interstate 35 near the south Wichita Turnpike Interchange in Sedgwick County, Kansas. At milepost 37.8, at 1:39 p.m., Wolf swerved to avoid Roy's vehicle and rolled his Mercedes. Wolf claims he was injured as a result and is entitled to damages in excess of $75,000. Defendant Allstate Indemnity Company provided automobile liability insurance to Wolf and asserts a subrogation claim of $4,500 for personal injury protection benefits paid on behalf of Wolf.

"Craig Wilkins was also driving in a northbound direction in the northbound lanes of Interstate 35 near the south Wichita Turnpike Interchange in Sedgwick County, Kansas, in a 2002 Dodge truck. At milepost 37.8, at 1:39 p.m., Wilkins' truck struck Roy's vehicle in a head-on collision. Roy, Wilkins, and a passenger in Wilkins' vehicle, Chase Wilkins, were killed. Wilkins' two other passengers, Stacy Wilkins and Dakota Wilkins were injured. Stacy Wilkins, Dakota Wilkins, and additional defendants Taylor, Mike, and Janet Wilkins seek unspecified damages. Defendant Farm Bureau Mutual Insurance Company provided automobile liability insurance to Wilkins and asserts a subrogation claim of $30,900 for personal injury protection benefits paid on behalf of the Wilkins defendants. Defendant Wesley Medical Hospital asserts a hospital lien for emergency services provided to Stacy Wilkins (lien amount $33,804.15), Dakota Wilkins (lien amount $20,346.01), and Chase Wilkins (lien amount $13,215.22).

"James L. Brooks, driving a 1995 Ford truck, was also traveling in a northbound direction in the northbound lanes of Interstate 35 near the south Wichita Turnpike Interchange in Sedgwick County, Kansas. At milepost 37.8, at 1:39 p.m., Brooks swerved to avoid the collision between Wilkins and Roy and hit a barrier wall. Brooks and his passenger, Steven Early, were served but have not appeared to assert claims.

### "Proceedings in U.S. District Court

"On November 3, 2005, American Family filed an interpleader complaint with regard to the above detailed events and paid $300,000 into court. The initial complaint has been modified and the parties are now proceeding on a third amended interpleader complaint. Count 1 of the third amended interpleader complaint seeks: 1) that each of the defendants be ordered to interplead and settle among themselves their rights and claims to the 'sum of $300,000 due and payable under the Policy;' 2) a temporary and permanent order from this court 'enjoining and restraining' the defendants from 'instituting or prosecuting further any proceedings in any state or United States court on account of the accident or the Policy'; 3) that American Family be 'fully and finally discharged from all further liability and further obligation to defend by reason of payment of proceeds of the Policy into this Court'; and 4) 'rea-

sonable and proper attorneys' fees and costs.' Count 2 of the third amended interpleader complaint seeks that American Family be 'fully and finally discharged from all further obligation to defend David Roy and Mary Austin, coexecutors of the Estate of Laverne Roy.'

"Defendants answered this third amended interpleader complaint and asserted the following counterclaims and cross-claims: 1) Wolf asserts a counterclaim against American Family, a counterclaim against Roy's estate, and a cross-claim against Roy's estate; 2) the Wilkins defendants assert a counterclaim against American Family, a cross-claim against Roy's estate, and a cross-claim against defendant Farm Bureau Mutual Insurance Company (their insurer) for under-insured motorist benefits; and 3) Jones asserts a cross-claim against Roy's estate, and a cross-claim against defendant State Farm Mutual Automobile Insurance Company (her insurer) for under-insured motorist benefits."

## ANALYSIS

K.S.A. 60-3201 authorizes this court to answer certified questions of law from a United States District Court when the questions may be determinative of the cause then pending in the certifying court and there appears to be no controlling precedent in this State. Certified questions, by definition, turn on legal issues. Therefore, we review such questions using an unlimited standard. Our answer to a certified question must be based on Kansas precedent rather than federal rulings interpreting Kansas law. *Burnett v. Southwestern Bell Telephone*, 283 Kan. 134, 136, 151 P.3d 837 (2007).

1. WHEN "OCCURRENCE" IS NOT DEFINED IN AN AUTOMOBILE LIABILITY POLICY, WHAT TEST SHOULD BE APPLIED UNDER KANSAS LAW IN DETERMINING WHETHER THERE ARE MULTIPLE "OCCURRENCES" AND, IF SO, THE NUMBER OF "OCCURRENCES"?

We interpret the terms of an insurance policy by applying the following rules of construction:

"The language of an insurance policy, like any other contract, must, if possible, be construed in such way as to give effect to the intention of the parties. [Citations omitted.] In construing a policy of insurance, a court should consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter, and the purpose to be accomplished. [Citation omitted.]

"Because the insurer prepares its own contracts, it has a duty to make the meaning clear. If the insurer intends to restrict or limit coverage under the policy,

it must use clear and unambiguous language; otherwise, the policy will be liberally construed in favor of the insured. [Citations omitted.] If an insurance policy's language is clear and unambiguous, it must be taken in its plain, ordinary, and popular sense. [Citation omitted.] In such case, there is no need for judicial interpretation or the application of rules of liberal construction. [Citation omitted.] The court shall not make another contract for the parties and must enforce the contract as made. [Citations omitted.]

"However, where the terms of an insurance policy are ambiguous or uncertain, conflicting, or susceptible of more than one construction, the construction most favorable to the insured must prevail. [Citations omitted.]

" 'To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning.' [Citation omitted.]

"Whether a written instrument is ambiguous is a question of law to be decided by the courts. [Citation omitted.] Courts should not strain to create an ambiguity where, in common sense, there is not one. [Citation omitted.] The test in determining whether an insurance contract is ambiguous is not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean [Citation omitted.]" *O'Bryan v. Columbia Ins. Group*, 274 Kan. 572, 575-76, 56 P.3d 789 (2002).

American Family argues that the term "occurrence" is not ambiguous even though it is not defined in the policy. The defendants, on the other hand, assert that the term is ambiguous because it is subject to conflicting meanings in the various cases that have addressed its definition. Courts have applied three tests for defining the term "occurrence." In determining whether there is a single or multiple occurrences under the policy limits, most courts consider the cause of the injury. A minority of courts consider the term "occurrence" to refer to the effects. A third category of courts consider the event that triggered liability to determine whether there are single or multiple occurrences under the policy limits. Annot., 64 A.L.R.4th 668, 673-74. Because the policy at issue in this case does not define the term "occurrence" and the cases from various courts demonstrate that the term "occurrence" is susceptible to conflicting meanings, we find the term to be ambiguous. See *Narron v. Cincinnati Ins. Co.*, 278 Kan. 365, 371, 97 P.3d 1042 (2004).

Kansas courts appear to have applied two of the three tests for defining the term "occurrence" as it relates to the limits of an insurer's liability. In *Mid-Century Ins. Co. v. Shutt*, 17 Kan. App. 2d 846, 845 P.2d 86 (1993), the Court of Appeals considered the event that triggered liability to determine the number of occurrences and establish the insurer's maximum liability. In *Shutt*, a 3-year-old child was struck by a car. The child sued the owner of the car, claiming two separate legal theories—negligence by the driver and negligent entrustment by the driver's parents, who were the owners of the car. The child argued that the insurer was liable for two occurrences because the accident was caused by both the driver's negligence and the parents' negligent entrustment. The *Shutt* court rejected the plaintiff's cause test and held that there was only one occurrence because there was only one event that triggered liability under the insurance policy—striking the child with the car. 17 Kan. App. 2d at 851.

In *Hodgson v. Bremen Farmers' Mut. Ins. Co.*, 27 Kan. App. 2d 231, 3 P.3d 1281, *rev. denied* 268 Kan. 886 (1999), the Court of Appeals relied on its decision in *Shutt* and applied the liability-triggering event test. In *Hodgson*, a dog attacked a boy. As the boy's father was running to rescue the boy, he slipped, fell, and tore his rotator cuff. The father was eventually able to free the boy from the dog, but both the father and the boy suffered injuries. The boy and his father sued the dog's owner, claiming negligent failure to contain the dog. The parties settled before trial and stipulated to $50,000 in damages. The dog owner's insurance policy capped liability coverage at $25,000 per occurrence. The *Hodgson* court concluded that the policy language was ambiguous and construed it in favor of the insured, holding that there were two events triggering contractual liability under the insurance policy—the dog attack and the father's fall. 27 Kan. App. 2d at 236. The *Hodgson* court distinguished the events triggering liability from the causative negligent acts, stating:

"[The insurer] argues [the father] would not have been running but for the dog attack. While this fact would be significant for tort analysis, it does not resolve [the insurer's] liability under the insurance contract. [The insurer's] liability under tort is not in question here." 27 Kan. App. 2d at 234.

Without addressing *Shutt* and *Hodgson*, this court applied a causation test to determine the number of occurrences in *Wilson v. Ramirez*, 269 Kan. 371, 2 P.3d 778 (2000). *Wilson* involved a medical malpractice action for failure to diagnose and loss of chance of survival. Wilson sought treatment from Dr. Ramirez for a recurring lesion on his lower lip. Dr. Ramirez removed the lesion and sent it to pathology to determine if it was cancerous. The pathology report was negative. Thereafter, Wilson sought treatment from Dr. Ramirez on four other occasions over the next year and a half for the same recurring lesion. Relying on the negative pathology report from Wilson's first visit, Dr. Ramirez failed to diagnose the lesion as cancer on each visit. Wilson sued Dr. Ramirez, claiming five separate acts of medical malpractice that caused five separate and distinct injuries. Noting that Dr. Ramirez continued to rely on the negative pathology report throughout his treatment, the *Wilson* court held that there was one "proximate, uninterrupted, and continuing cause" that resulted in all of Wilson's injuries and damages—Dr. Ramirez's failure to diagnose. 269 Kan. at 380. As a result, there was only one occurrence for purposes of determining the maximum liability for Dr. Ramirez's insurance policy. 269 Kan. at 380-81.

In *AT&SF Ry. Co. v. Stonewall Ins. Co.*, 275 Kan. 698, 738-39, 71 P.3d 1097 (2003), this court applied a causation test in concluding that 3,800 hearing loss claims constituted one occurrence for determining the amount of Santa Fe's self-insured retention. The single occurrence was Santa Fe's failure to institute a hearing conservation program to protect its employees from the high-level noise inherent in the operation of its business. The parties had agreed to apply a causation test but disagreed as to whether the test should be broadly or narrowly construed. In deciding to apply a broad causation test, the *AT&SF* court recognized general similarities with *Wilson*. The *AT&SF* court noted that Santa Fe could not control the cause of its employees' hearing loss just like Dr. Ramirez could not control the cause of Wilson's lesion. Santa Fe's failure to protect its employees with a hearing conservation program was analogous to Dr. Ramirez's failure to diagnose Wilson's cancer. 275 Kan. at 736-37.

In *Shutt* and *Hodgson*, the Court of Appeals focused on the event triggering liability under the insurance contract to determine the number of occurrences. In *Wilson* and *AT&SF*, this court looked at the cause of liability to determine the number of occurrences. While, on the surface, it may appear that there is a conflict between the Court of Appeals' analysis in *Shutt* and *Hodgson* and this court's analysis in *Wilson* and *AT&SF*, a more detailed review reveals that both courts applied the same basic principle.

Legal commentators have divided the tests for determining the number of occurrences into three categories: cause, effect, and event-triggering liability. Annot., 64 A.L.R.4th 668, 673-74. The parties in this case assume that these categories are mutually exclusive. This assumption is correct in regards to the cause and effect categories. Under the cause test, a court must determine whether there was one proximate, uninterrupted, continuing cause that resulted in all the injuries. *Wilson*, 269 Kan. at 380-81; *Hyer v. Inter-Insurance Exchange*, 77 Cal. App. 343, 350, 246 Pac. 1055 (1926) (holding that there was one occurrence when a vehicle struck two other vehicles). If one cause is interrupted and replaced by another intervening cause, then the chain of causation is broken, resulting in two or more occurrences depending on the number of intervening causes. *Home Indem. Co. v. City of Mobile*, 749 F.2d 659, 662 (11th Cir. 1984) (holding that there was one occurrence under the insurance policy for each negligently maintained storm drain or sewer that flooded and caused damage to property regardless of the number of properties each drain or sewer damaged). However, under the effect test, the policy coverage limits are based on the effect of the accident, extending the insured's policy limits to each injured party. See, *e.g.*, *Anchor Casualty Co. v. McCaleb*, 178 F.2d 322, 324-25 (5th Cir. 1949) (concluding that each property owner damaged by a series of oil rig explosions was entitled to the $5,000 per accident limit).

The insurance policy at issue in this case states that American Family will "pay no more than these maximums no matter how many vehicles are described in the declarations or insured persons, claims, claimants, policies or vehicles are involved." This language

clearly indicates that American Family did not intend to use the effects test to determine the number of occurrences.

Although the cause and effects tests are mutually exclusive, the cause and liability-triggering event tests are not. In defining the term "accident" and equating it to an "occurrence," the *Hyer* court noted that in some classes of cases the term could refer to the cause of the injury or loss; in other cases, the term accident or occurrence could refer to the event, *i.e.,* "the unintended and unexpected loss or hurt apart from its cause"; and in still other cases, it could refer to both the event and the cause. 77 Cal. App. at 348. Thus, the liability-triggering event test, in certain circumstances, is a narrow class that can overlap with the cause test. Consequently, the Court of Appeals and this court have essentially applied the same underlying principle in analyzing the term "occurrence" as it relates to liability limits for an insurance policy. Based on prior Kansas precedent, we conclude that the number of occurrences is determined by the cause of the injury. Our answer to the first certified question regarding the test to be applied is causation.

2. WHEN MULTIPLE COLLISIONS INVOLVING SEVERAL VEHICLES AND INJURED PERSONS RESULT FROM THE ACTIONS OF THE INSURED DRIVER, IS EACH COLLISION AN "OCCURRENCE"?

American Family argues that there was only one proximate cause for all of the injuries received by all of the injured persons. According to American Family, the single proximate cause for all of the injuries was Roy's negligent driving on the wrong side of the highway. The defendants, however, argue that there were three occurrences related to Roy's separate encounters with the Jones vehicle, the Wolf vehicle, and the Wilkins vehicle.

We do not agree with American Family's argument that the cause was Roy's negligent driving on the wrong side of the road. If Roy had not encountered another vehicle on the wrong side of the road, there would not have been a collision. Thus, the cause of the collisions at issue in this case is the encounter between Roy's vehicle and an oncoming vehicle. Driving the wrong way on the highway is an antecedent cause, but the most immediate cause of

the collisions was Roy's negligence in driving in the path of an oncoming vehicle. In reaching this conclusion, we are not shifting the liability to the driver of the oncoming vehicle. Rather, we are limiting the causation to Roy's negligence as he encountered another vehicle.

However, our rejection of American Family's argument regarding the cause does not imply that we agree with the defendants' argument that there were three separate occurrences. Determining the number of occurrences requires further analysis. Because there are no similar Kansas cases involving multiple automobile collisions, we turn to cases from other jurisdictions for help in analyzing this question.

In *Hyer*, the insured's chauffeur lost control of the car, crossed the centerline and struck an oncoming vehicle. The force of the impact broke the steering gear in the insured's vehicle, causing it to become unmanageable, and the insured's vehicle careened into another oncoming vehicle. Recognizing that the broken steering gear was a causal connection between the collision with the first car and the collision with the second car, the *Hyer* court described the second collision as the "incident to the accident" and concluded that there was only one accident. 77 Cal. App. at 351, 355.

In *Truck Ins. Exch. v. Rohde*, 49 Wash. 2d 465, 303 P.2d 659 (1956), the insured motorist veered onto the wrong side of the highway and struck three oncoming motorcycles that were traveling about 75 feet apart in an echelon formation. The motorist struck the first motorcycle at the left front fender, causing his vehicle to turn counterclockwise. The vehicle then struck the second motorcycle with the right front fender, causing it to turn further in a counterclockwise direction. The vehicle then collided with the third motorcycle on the right side near the rear of the vehicle. The *Rohde* court concluded that there was one occurrence under the motorist's insurance policy, noting that the motorist's "vehicle went out of control, either before or simultaneously with the first collision, and that it remained out of control until it came to rest after the third collision." 49 Wash. 2d at 471.

In *Olsen v. Moore*, 56 Wis. 2d 340, 202 N.W.2d 236 (1972), the insured motorist lost control of his vehicle, crossed the median strip

and collided with an oncoming vehicle, forcing it into the ditch. The insured motorist's vehicle was deflected into the other lane where it collided with a second oncoming car. Noting that there was virtually no time or space interval between the collisions and the motorist never regained control of his vehicle, the *Olsen* court concluded that there was one occurrence under the motorist's insurance policy. 56 Wis.2d at 350.

In *Hartford Acc. & Ind. v. Wesolowski*, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 305 N.E.2d 907 (1973), an insured's vehicle struck an oncoming vehicle, ricocheted off it, and struck a second oncoming vehicle approximately 100 feet away. Relying on the extremely short time period between the first collision and the second, the *Wesolowski* court stated that the "continuum between the two impacts was unbroken, with no intervening agent or operative factor." 33 N.Y.2d at 174. The *Wesolowski* court applied the liability-triggering event test to conclude that there was only one "three-car" accident under the insured's policy. 33 N.Y.2d at 174.

In *Liberty Mut. Ins. Co. v. Rawls*, 404 F.2d 880 (5th Cir. 1969), the insured was fleeing from two deputy sheriffs at a high rate of speed. The insured struck the left rear of a vehicle in front of him on the highway, knocking the vehicle off the highway to the right. The insured remained in control of his vehicle and continued his flight. A few seconds later, the insured veered across the centerline and collided with an oncoming car. The *Rawls* court concluded that there were two accidents under the insured's liability policy because the impacts were separated by 2 to 5 seconds in time and 30 to 300 feet in distance and there was no evidence that the insured lost control of his vehicle after striking the first vehicle. 404 F.2d at 880-81.

In *Illinois Nat'l Ins. Co. v. Szczepkowicz*, 185 Ill. App. 3d 1091, 542 N.E.2d 90 (1989), a semi-trailer truck turned northward onto a four-lane, divided highway from a private driveway. Wanting to go southbound on the highway, the truck turned left onto a crossover that connected the northbound and southbound lanes. Because traffic in the southbound lanes prevented the truck from completing its turn, the back end of the truck was blocking both northbound lanes. Due to foggy conditions and an inoperative side

clearance light on the truck, a northbound vehicle in the right lane struck the side of the semi-trailer. The truck driver pulled forward about 12 feet almost immediately after the collision and then stopped again. Five minutes later, a second vehicle traveling in the left northbound lane struck side of the semi-trailer again. The *Szczepkowicz* court concluded that there were two accidents under the insured's liability policy. The *Szczepkowicz* court reasoned that the collisions were separated in time, that the truck driver remained in control of his truck after the first collision, and that the conditions for each accident were different because the truck driver moved the truck enough to clear one of the northbound lanes after the first collision. 185 Ill. App. 3d at 1096.

*Voigt v. Riesterer*, 187 Wis. 2d 459, 523 N.W.2d 122 (1994), involved a multi-vehicle collision on a two-lane highway. The *Voigt* court described it as follows:

"Traveling east, plaintiff Jeffrey Voigt was operating a pickup truck owned by Jeff Mavis, who was in the passenger seat. Brockman, with Kevin Baumgartner as a passenger, was operating a car in a westerly direction. Brockman's automobile crossed the centerline of Highway S and collided head-on with the pickup truck driven by Voigt. Within a few minutes, a vehicle driven by Dion Haase was traveling in a westerly direction and came upon the Voigt-Brockman accident. Haase parked his vehicle on the north shoulder of the highway across from the two vehicles. Three to five minutes after the first collision, a second collision occurred when Robert Riesterer, also traveling in a westerly direction, struck the back end of Brockman's automobile, which propelled Brockman into Voigt again. Riesterer then bounced off the back of Brockman's automobile and struck the parked Haase vehicle." 187 Wis. 2d at 462.

Noting that the collisions were separated in time, the *Voigt* court concluded that there were two occurrences within the meaning of the insured's liability policy. 187 Wis. 2d at 467.

We agree with the reasoning from these cases, which distinguishes the number of occurrences based on the time-space continuum between the collisions and the insured driver's level of control over the vehicle. Collisions with multiple vehicles constitute one occurrence when the collisions are nearly simultaneous or separated by a very short period of time and the insured does not maintain or regain control over his or her vehicle between collisions. When collisions between multiple vehicles are separated by

a period of time or the insured maintains or regains control of the vehicle before a subsequent collision, there are multiple occurrences.

Although the federal district court presumes that the answer to the second certified question is yes or no, we cannot provide such a definite response. Rather, the answer is dependent on the factual circumstances, so our answer to the question is maybe. When multiple collisions involving several vehicles and injured persons occur, each collision *may be* an occurrence under an automobile liability insurance policy.

### 3. IF THE ANSWER TO QUESTION NUMBER IS "YES," HOW MANY OCCURRENCES WERE THERE UNDER THE FACTS?

Although we have not answered question 2 with a definitive "yes" as the district court presumed, our answer requires us to consider the facts of this case to determine the number of occurrences involved. Under our analysis of the space-time continuum and Roy's control of the vehicle, we conclude that there were two occurrences in this case.

The first occurrence took place when Roy encountered Jones' vehicle, forcing Jones to swerve to miss Roy's truck and resulting in injuries and damages to Jones and her vehicle. If Jones had successfully maneuvered around Roy's truck without injury, there would have been no occurrence.

The second occurrence took place when Wolf swerved to avoid Roy's truck and rolled his car. Roy's encounter with Wolf was separated by approximately 1 minute in time and ½ mile in space from Roy's encounter with Jones. Roy continued to have control over his vehicle after his encounter with Jones, and Roy's encounter with Wolf was not related to his encounter with Jones. However, Roy's head-on collision with the Wilkins' van was in such rapid instantaneous succession and occurred so close to the same location as Roy's encounter with Wolf as to make it a nearly simultaneous event. Because the encounter with Wolf's car and his collision with the Wilkins' van were not separated by time and space, they cannot be considered separate occurrences.

Under the facts of this case, there were two occurrences.

### 4. WHAT IS THE MAXIMUM AMOUNT OF AMERICAN FAMILY'S LIABILITY UNDER THE POLICY?

The American Family policy provided a per person limit of $100,000 and a per occurrence limit of $300,000. The federal district court did not specify whether these limits applied to both bodily injury and property damage, but it set forth the following policy language:

> "1. The bodily injury liability limit for 'each person' is the maximum for all damages sustained by all persons as a result of bodily injury to one person in any one occurrence.
> "2. Subject to the bodily injury liability limit for 'each person,' the bodily injury liability limit for 'each occurrence' is the maximum for bodily injury sustained by two or more persons in any one occurrence
> "3. The property damage liability limit for 'each occurrence' is the maximum for all damages to all property in any one occurrence."

Because the federal district court did not provide the policy language related to the limits on property damage, we decline to fully answer the question presented by the federal district court. However, we will answer the question in relation to the limits for bodily injury.

When the insurance policy unambiguously provides that its per occurrence limit is subject to its per person limit, the maximum bodily injury damages claimed by any one person are subject to the per person limit even if more than one person is injured. *Farm Bureau Mut. Ins. Co. v. Winters*, 248 Kan. 295, 300-01, 806 P.2d 993 (1991); *Farmers Ins. Co. v. Rosen*, 17 Kan. App. 2d 468, 473, 839 P.2d 71, *rev. denied* 252 Kan. 1091 (1992). The American Family language clearly subjects the per occurrence limit to the per person limit. Thus, the per person limit applies in this case regardless of whether more than one person was injured by the occurrence.

For the first occurrence with Jones, one person suffered bodily injury. American Family is subject to a maximum liability of $100,000 for bodily injury for this occurrence.

For the second occurrence with the Wolf and the Wilkins vehicles, the facts as presented by the federal district court indicate that one person was injured in the Wolf vehicle and four persons

were injured or killed in the Wilkins vehicle. Applying only the $100,000 per person limit would result in $500,000 as the maximum. However, the American Family policy limits the coverage to $300,000 per occurrence. Because all five individuals were injured in the same occurrence, the $300,000 per occurrence limit would apply.

Adding together the liability for personal injury for both occurrences, the maximum amount of American Family's liability for bodily injury only under its policy with Roy is $400,000.

DAVIS, J., not participating.

MCANANY, J., assigned.