Cherity **KERNS** and William Kerns, Appellants,

v.

**ALLIANCE INDEMNITY COMPANY,** Respondent.

**WD79948**

Missouri Court of Appeals, Western District.

April 25, 2017

---

Michael S. Mogenson, Mission, KS, Attorney for Appellants.

Mark B. Schaffer and Darya V. Lyeshchenko, Overland Park, KS, Attorneys for Respondent.

Before Division Two: Thomas H. Newton, Presiding Judge, and James Edward Welsh and Karen King Mitchell, Judges

Cherity and William Kerns appeal from the grant of summary judgment in favor of Alliance Indemnity Company (Insurer) on their claim for uninsured motorists benefits under their automobile insurance policy with Insurer. Cherity Kerns was involved in a head-on collision in the state of Kansas between a rental car she was driving and a car owned by one person but operated by another. Kerns obtained a judgment in Kansas against the operator of the other vehicle for negligence and against the owner of the other vehicle for negligently entrusting the vehicle to the operator at the time of the accident. Under Kansas law, each tortfeasor was assessed 50% liability for the total of Kerns's damages. But neither the owner nor the operator had liability insurance. Accordingly, Kerns sought to recover the maximum uninsured motorist benefits provided by her policy against each tortfeasor. She also sought to stack the coverage provided for each of three automobiles covered by Insurer's policy for a total of six times the per-person limit of liability provided in the uninsured motorist coverage portion of the policy. Both parties sought summary judgment. The court below granted Insurer's motion and denied Kerns's motion. Finding no error, we affirm.

## Background

Cherity Kerns, a Kansas resident, was injured in an automobile accident that occurred in Kansas, while she was operating a rental car that was registered in Missouri. Kerns and her husband filed a lawsuit in Kansas and obtained a judgment against the two uninsured persons who caused that accident—the operator of the other vehicle (for general negligence) and the owner of the other vehicle (for negligent entrustment). The court entered judgment against each tortfeasor separately in the amount of $1,405,791.65.

At the time of the accident, the Kernses had an automobile policy issued by Insurer in Kansas that included uninsured motorist ("UM") coverage of $100,000 per person and $300,000 per accident; the policy covered three separate vehicles. The Kernses submitted a UM claim to Insurer and Insurer paid them $100,000—the per-person limit of UM coverage under the policy. The Kernses then filed a lawsuit in Jackson County, Missouri, against Insurer seeking additional UM coverage from Insurer, arguing they were entitled to stack coverage based on the number of vehicles insured under the policy and the number of uninsured persons who caused the accident.

The Kernses filed a motion for partial summary judgment, arguing that, under Kansas law, Insurer was required to pro-

vide benefits related to each of the two uninsured motorists deemed at fault in the accident. The Kernses then filed a second motion for summary judgment, arguing that because of an ambiguity in the policy language, Insurer was required to stack the uninsured motorist benefits provided for each of the three vehicles insured in the policy. Insurer responded to the motions, including the statements of uncontroverted material facts, acknowledging that most were, in fact, uncontroverted. Insurer then submitted additional uncontroverted material facts of its own, which the Kernses conceded, wholesale, were uncontroverted.

Insurer then filed a suit in Kansas against the Kernses, seeking a declaratory judgment on the exact same issue of UM coverage and benefits, while simultaneously seeking a stay of the Missouri lawsuit filed by the Kernses. *All. Indem. Co. v. Kerns*, 360 P.3d 491, *1 (Kan. Ct. App. 2015). Insurer obtained summary judgment in its favor in the Kansas declaratory judgment action, and the Kernses appealed. *Id.* While the Kansas appeal was pending, the Missouri circuit court, *sua sponte*, lifted the previously granted stay. *Id.* at *2. The Missouri court then denied both of the Kernses' motions for partial summary judgment. Following the Missouri court's ruling, the Kansas Court of Appeals dismissed the pending appeal as moot. *All. Indem. Co.*, 360 P.3d 491 at *2.

Insurer then filed the motion at issue in this appeal—a motion to dismiss or grant judgment on the pleadings in favor of Insurer on the Kernses' claims. The motion cited the circuit court's earlier rulings, denying the Kernses' motions for partial summary judgment on the ground that Kansas law applied and precluded the recovery sought. Insurer also filed suggestions in support of its motion, with attached exhibits. The Kernses filed a responsive motion, arguing that, because of the attached exhibits, Insurer's motion was improperly submitted as a motion for judgment on the pleadings and should, therefore, be either denied or treated as a motion for summary judgment as required by Rule 55.27(b).[1] The circuit court entered an order, notifying the parties that it would treat Insurer's motion as a motion for summary judgment under Rule 74.04, and it then set a "briefing schedule" following the deadlines set forth in Rule 74.04.

After receiving suggestions in support of summary judgment from Insurer and suggestions in opposition from the Kernses, the court entered summary judgment in favor of Insurer, finding that Kansas law applied and prohibited the stacking sought by the Kernses. The Kernses appeal.

## Analysis

The Kernses raise three points on appeal. First, they argue that the circuit court erred in granting summary judgment for Insurer because Insurer's motion failed to comply with the requirements of Rule 74.04. Second, they argue that the circuit court erred in granting summary judgment in favor of Insurer and denying summary judgment to the Kernses on the question of whether Insurer owed UM benefits for each of the two separate tortfeasors. And, finally, they argue in their third point that the circuit court erred in granting summary judgment in favor of Insurer and denying summary judgment to the Kernses on the issue of whether the policy was ambiguous and permitted the

1. All rule references are to the Missouri Supreme Court Rules (2016), unless otherwise stated.

Kernses to stack UM coverage for each of the three vehicles covered by their policy.

### A. Standard of Review [2]

"An appellate court's review of the grant of summary judgment is *de novo.*" *Energy Creates Energy, LLC v. Heritage Grp.*, 504 S.W.3d 142, 147 (Mo. App. W.D. 2016). "The record is reviewed in the light most favorable to the party against whom judgment was entered, and the non-movant is given the benefit of all reasonable inferences from the record." *Id.* That being said, "[f]acts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion." *Id.* (quoting *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993)).

### B. There was no violation of Rule 74.04.

In their first point on appeal, the Kernses argue that Insurer's motion to dismiss or for judgment on the pleadings "was not in compliance with Rule 74.04 in that [Insurer] failed to present a statement of uncontroverted material fact, but instead, assumed that a decision overruling [the Kernses'] motion for summary judgment meant that summary judgment must be entered for [Insurer]."

Though Insurer's motion was initially filed as a motion to dismiss or enter judgment on the pleadings, Insurer included exhibits with the motion. Rule 55.27(b) provides that,

> [i]f, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by

the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 74.04, and all parties shall be given reasonable opportunity to present all materials made pertinent to such a motion by Rule 74.04.

Here, after Insurer filed its motion, the Kernses, citing Rule 55.27(b), asked that Insurer's motion be treated as one for summary judgment. The circuit court agreed, gave all parties notice of its intent to treat the motion as one for summary judgment, and set a "briefing schedule" in compliance with the deadlines imposed by Rule 74.04. Thereafter, Insurer filed a supplemental brief in support of its motion, which included a "statement of facts," setting forth nine distinct factual assertions in separately numbered paragraphs with citations to the pleadings, motions, and discovery in the case purportedly supporting the fact stated therein.

The Kernses argue that Insurer's motion failed to include a "statement of uncontroverted material fact" as is required by Rule 74.04. Rule 74.04(c) requires "[a] statement of uncontroverted material facts [to] be attached to the motion." It further requires the statement to "state with particularity in separately numbered paragraphs each material fact as to which movant claims there is no genuine issue, with specific references to the pleadings, discovery, exhibits or affidavits that demonstrate the lack of a genuine issue as to such facts." *Id.*

Though Insurer's statement of facts was not denominated as a statement of *uncontroverted material* fact, it plainly complied with Rule 74.04(c) in all other respects. And the Kernses' response to Insurer's

---

**2.** "Regardless of which state's law governs the substantive issues involved in this case, ... '[p]rocedural questions are determined by the state law where the action is brought.'" *Williams v. Silvola,* 234 S.W.3d 396, 399 (Mo.

App. W.D. 2007) (quoting *Peoples Bank v. Carter,* 132 S.W.3d 302, 305 (Mo. App. W.D. 2004)). "The standard of review is a procedural matter for which this court will apply Missouri law." *Id.*

supplemental brief acknowledged that each fact identified in Insurer's statement of facts was, in fact, uncontroverted. The Kernses then identified eight additional facts that they claimed were material to the issues, all of which were accepted as uncontroverted by Insurer in its reply. In short, there was no violation of Rule 74.04(c).[3]

Point I is denied.

## C. The Relevant Policy Language

The second and third points on appeal both relate to UM coverage and benefits under Insurer's policy. The policy declarations page indicates that the policy provided coverage for liability, personal injury protection from both uninsured and underinsured motorists, damage to covered automobiles, and towing and labor. The limits of liability listed on the declarations page for personal injury protection were identified as "$100,000/Person—$300,000/Accident." In the Vehicle Schedule, the policy indicates coverage for three separate vehicles, each identified as having uninsured and underinsured motorist coverage with the liability limits identified on the declarations page. There is a separate premium identified for each vehicle related to the uninsured/underinsured motorist coverage.

Part C of the policy relates to Uninsured Motorists Coverage, but it is subject to an endorsement related specifically to uninsured motorists coverage in Kansas. The endorsement provides that Insurer would "pay damages which an 'Insured' is legally entitled to recover from the owner or operator of an 'uninsured motor vehicle' or 'underinsured motor vehicle' because of 'bodily injury': 1. Sustained by an 'Insured'; and 2. Caused by an accident."

The Limit of Liability section provides:

A. The limit of liability shown in the Declarations for each person for Uninsured Motorists Coverage is our maximum limit of liability for all damages, including damages for care, loss of services or death, arising out of "bodily injury" sustained by any one person in any one accident. Subject to this limit for each person, the limit of liability shown in the Declarations for each accident for Uninsured Motorists Coverage is our maximum limit of liability for all damages for "bodily injury" resulting from any one accident.

This is the most we will pay regardless of the number of:

1. "Insureds";

2. Claims made;

3. Vehicles or premiums shown in the Declarations;

4. Premiums paid; or

5. Vehicles involved in the accident.

The coverage limit provided for Uninsured Motorists Coverage applies separately to damages caused by an accident with an "uninsured motor vehicle" or "underinsured motor vehicle".

---

**3.** It seems that the Kernses' real complaint is that Insurer asked the court to rely on its prior rulings denying the Kernses' motions for partial summary judgment. Though the Kernses are correct that the mere denial of a motion for summary judgment in favor of one party does not necessarily mean it must be granted in favor of the opposing party, under the circumstances of this case, it does. The court's prior rulings were on matters of law; the court decided the legal issues against the Kernses, which necessarily meant that the legal issues favored Insurer's position. The Kernses acknowledge this fact in arguing for review of the denial of their summary judgment motions in Points II and III on the ground that the merits of both parties' motions are "completely intertwined." The merits of these legal claims will be further discussed in the analysis of Points II and III that follows.

B. No one will be entitled to receive duplicate payments for the same elements of loss under this coverage and Part A or Part B of this policy.

C. We will not make a duplicate payment under this coverage for any element of loss for which payment has been made by or on behalf of persons or organizations who may be held legally responsible.

Regarding other insurance, the Kansas endorsement provides:

If there is other applicable insurance available under one or more policies or provisions of coverage that is similar to the insurance provided under this Part of the policy:

1. Any recovery for damages under all such policies or provisions of coverage may equal but not exceed the highest applicable limit for any one vehicle under any insurance providing such coverage on either a primary or excess basis.

2. Any insurance we provide with respect to a vehicle you do not own, including any vehicle while used as a temporary substitute for "your covered auto", shall be excess over any collectible insurance providing coverage on a primary basis.

3. If the coverage under this policy is provided:

 a. On a primary basis, we will pay only our share of the loss that must be paid under insurance providing coverage on a primary basis. Our share is the proportion that our limit of liability bears to the total of all applicable limits of liability for coverage provided on a primary basis.

 b. On an excess basis, we will pay only our share of the loss that must be paid under insurance providing coverage on an excess basis. Our share is the proportion that our limit of liability bears to the total of all applicable limits of liability for coverage provided on an excess basis.

**D. The policy's limit of liability for UM benefits is determined by the effects of a single accident and not by the number of tortfeasors contributing to that accident.**

■ In their second point on appeal, the Kernses argue that the court erred in finding that, as a matter of Kansas law, Insurer was not required to pay out the maximum UM benefits for each separate tortfeasor. The Kernses argue that Kansas law applies and that, because Kansas is a comparative fault state without joint and several liability, Insurer was required to provide the maximum UM benefits identified in the policy with respect to each of the two tortfeasors in the accident.

As identified, *infra*, the Kernses' policy provided liability limits of $100,000/person or $300,000/accident. The limit of liability section indicated that these limits were Insurer's "maximum limit of liability for all damages, including damages for care, loss of services or death, arising out of 'bodily injury' sustained by *any one person* in *any one accident*." (Emphasis added.) It further indicated that "[t]his is the most we will pay regardless of the number of: 1. 'Insureds'; 2. Claims made; 3. Vehicles or premiums shown in the Declarations; 4. Premiums paid; or 5. Vehicles involved in the accident."

In addressing the limit of liability for UM coverage, the policy plainly indicates that it will pay one policy limit for all injuries sustained by a particular person in a single accident. And, here, where there was only one person injured in a single accident, that limit was $100,000, which Insurer has already paid. It would seem that, under the policy language, the Kerns-

es' argument might have merit if there were more than one "accident" at issue. But, rather than argue that there was more than one accident, the Kernses instead focus on the number of tortfeasors responsible for the damage resulting from the single accident. This argument, however, has already been rejected by Kansas courts.

In *Mid–Century Insurance Company v. Shutt*, 17 Kan.App.2d 846, 845 P.2d 86, 86 (1993), a child was injured upon being struck by a car while she was walking on the side of a road. The driver was insured under her parents' policy, which "provided for $100,000 maximum bodily injury liability for bodily injury sustained by one person in any occurrence." *Id.* The insurer paid out the $100,000 limit to the child in settlement of the claim against the driver. *Id.* at 86–87. The child then obtained a judgment against the driver's parents for negligent entrustment of the vehicle to the driver. *Id.* at 87. The insurer filed a declaratory judgment action seeking a declaration as to whether it was obligated under the policy to make a second payout to the child for the judgment against the driver's parents. *Id.* The trial court entered summary judgment for the insurer, indicating that it had no further liability to the child. *Id.* The child appealed. *Id.*

The issue presented on appeal was "whether the negligent entrustment of the automobile by the [parents] to their daughter[, the driver,] constituted a separate occurrence from [the driver's] negligence under the terms of the policy." *Id.* The policy defined "occurrence" as "a sudden event, including continuous or repeated exposure to the same conditions, resulting in bodily injury or property damage neither expected nor intended by the insured person." *Id.* The child argued that the negligent operation of the vehicle and the negligent entrustment of the vehicle

constituted two separate "occurrences," entitling her to two separate payments under the policy. *Id.* The appellate court disagreed. *Id.* at 88.

The court first noted that "[n]egligence and negligent entrustment are two separate legal theories." *Id.* at 87. It then analyzed the meaning of "occurrence" within the policy to determine whether separate theories of liability constituted separate occurrences. *Id.* at 88. After evaluating similar cases from other jurisdictions, the court concluded that "there was a single event (the accident) which triggered liability and, thus, only one occurrence." *Id.* at 89.

Similarly, in *Hodgson v. Bremen Farmers' Mutual Insurance Company*, 27 Kan. App.2d 231, 3 P.3d 1281, 1282 (1999), the court was again asked to construe the meaning of "occurrence" within a policy for purposes of applying the limit of liability. In *Hodgson*, a child "was attacked by a dog, and his father … ran to his rescue. While running, [Father] slipped and fell, tearing his rotator cuff." *Id.* Both Father and Child suffered injury and resulting damages. *Id.* They sued the dog's owner for negligent failure to contain the dog and, upon settlement, obtained a judgment in the amount of $50,000. *Id.* Owner's liability policy had a limit of $25,000 per occurrence, and it rendered a $25,000 payment to Child and Father. *Id.* Child and Father then filed a declaratory judgment action seeking to obtain a second $25,000 payment on the ground that there were multiple occurrences subject to the policy's $25,000 limit—specifically, they claimed that there were two occurrences: the dog attack and Father's fall. *Id.* at 1283, 1284. The trial court found that there were two occurrences, and Owner appealed. *Id.* at 1283.

Owner's policy defined "occurrence" as "an accident, including continuous or re-

peated exposure to substantially the same general harmful conditions, which results, during the policy period, in: ... **bodily injury**; or ... **property damage**." *Id.* at 1284. The appellate court noted that "[o]ccurrence ... largely was defined by equating it to an accident[, but a]ccident was not defined." *Id.* The court then noted that, "[w]here accident is not defined, 'it must be interpreted in its usual, ordinary, and popular sense,' but must be given a liberal construction since it is ambiguous." *Id.* (quoting *Brumley v. Lee*, 265 Kan. 810, 963 P.2d 1224, 1225 (1998)). The court then noted that, "[a]s typically used, an accident is an 'undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force.'" *Id.* (quoting *Harris v. Richards*, 254 Kan. 549, 867 P.2d 325, 325 (1994)). The court determined that "[t]he definition of occurrence in the instant case, when combined with the generally accepted definition of accident, is similar to the definition in *Shutt*." *Id.* "The analysis, therefore, focuses on the event or events which triggered liability." *Id.* "In Kansas, it is the number of events, not the number of causative negligent acts, which is dispositive." *Id.*

The court held that "the injuries suffered by [Child] and [Father] did not result from exposure to the same general harmful conditions." *Id.* at 1285.

> [Child] and [Father] were separated in space and time when the dog attack began. [Father] had to run to the rescue because he was not in proximity to the same general harmful condition as his son. [Father] was injured before he reached his son. [Child] was never in danger, by his exposure to the dog, of suffering the same injury as his father.

*Id.* Accordingly, the court held that, "[c]onstrued in favor of the insured, [Father's] fall was a second occurrence." *Id.* Thus,

"because the policy was ambiguous and the facts show[ed] two events which triggered liability, the facts ... present[ed] two occurrences, not one." *Id.* The court held that Insurer was liable for a second $25,000 payment. *Id.*

■ Unlike the policies in both *Shutt* and *Hodgson*, the Kernses' policy did not use the term "occurrence"; instead, it referred only to injury "sustained by any one person in any one accident." The policy, however, did not define "accident." As *Hodgson* noted, "[w]here accident is not defined, 'it must be interpreted in its usual, ordinary, and popular sense,' but must be given a liberal construction since it is ambiguous." *Id.* (quoting *Brumley*, 963 P.2d at 1225). *Hodgson* then liberally construed "accident" to mean "an 'undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force.'" *Id.* (quoting *Harris*, 867 P.2d at 325).

Here, there was but one event triggering liability: the head-on collision between the tortfeasor car and the Kernses' rented vehicle. Thus, under both *Shutt* and *Hodgson*, Insurer is liable for but one payment, which it has already made.

Both *Shutt* and *Hodgson* were most recently reviewed by the Kansas Supreme Court in *American Family Mutual Insurance Company v. Wilkins*, 285 Kan. 1054, 179 P.3d 1104, 1110 (2008). In *Wilkins*, the court first noted that the opinions, on the surface, appeared inconsistent with subsequent Kansas decisions that focused on causation of the harm triggering liability, rather than the number of events, for purposes of determining the number of "occurrences" under an insurance policy. *Id.* at 1111. But the court ultimately concluded that they were not.

The court first noted that "[l]egal commentators have divided the tests for deter-

mining the number of occurrences into three categories: cause, effect, and event-triggering liability." *Id.* But, contrary to the parties' assertions, the court noted that the categories were not necessarily mutually exclusive. *Id.* "Under the cause test, a court must determine whether there was one proximate, uninterrupted, continuing cause that resulted in all the injuries." *Id.* "If one cause is interrupted and replaced by another intervening cause, then the chain of causation is broken, resulting in two or more occurrences depending on the number of intervening causes." *Id.* "However, under the effect test, the policy coverage limits are based on the effect of the accident, extending the insured's policy limits to each injured party." *Id.* (citing *Anchor Cas. Co. v. McCaleb*, 178 F.2d 322, 324–25 (5th Cir. 1949), as an example of the effect test).[4]

The *Wilkins* court concluded that, "[a]lthough the cause and effects tests are mutually exclusive, the cause and liability-triggering event tests are not." *Id.* at 1112.

> [I]n some classes of cases the term [accident or occurrence] could refer to the cause of the injury or loss; in other cases, the term accident or occurrence could refer to the event, i.e., "the unintended and unexpected loss or hurt apart from its cause"; and in still other cases, it could refer to both the event and the cause.

*Id.* "Thus, the liability-triggering event test, in certain circumstances, is a narrow class that can overlap with the cause test." *Id.* The court concluded that "the number of occurrences [for which a liability limit applies] is determined by the cause of the injury." *Id.*

In *Wilkins*, a single driver was driving in the wrong direction on the interstate, and while doing so, two other vehicles were damaged when they rolled off the road upon swerving to avoid a collision with the driver and a third vehicle suffered damages after it struck the driver head-on. *Id.* at 1108. The driver's insurer filed an interpleader action, seeking to discern its liability to the various injured parties. *Id.* at 1108–09. The insurer argued that there was but one occurrence for all of the injuries—the driver's act of driving on the wrong side of the road. *Id.* at 1112. The injured parties, however, argued that there were three occurrences—one for each time the driver encountered another vehicle. *Id.* The court rejected the insurer's argument, noting that,

> [i]f [the driver] had not encountered another vehicle on the wrong side of the road, there would not have been a collision. Thus, the cause of the collisions at issue in this case is the encounter between [the driver's] vehicle and an oncoming vehicle. Driving the wrong way on the highway is an antecedent cause, but the most immediate cause of the collisions was [the driver's] negligence in driving in the path of an oncoming vehicle.

*Id.* The court noted, however, that it was not wholesale accepting the injured parties' argument either: "[O]ur rejection of [the insurer's] argument regarding the

---

4. The limit of liability in the policy at issue in *McCaleb* was $5,000/accident but not to exceed $25,000 for all damage sustained. *Anchor Cas. Co. v. McCaleb*, 178 F.2d 322, 324 (5th Cir. 1949). The court in *McCaleb* held that "[t]he wording 'each accident,' as used in the policy, must be construed from the point of view of the person whose property was injured." *Id.* at 324. This was because "an accident is defined as an event which, in the circumstances, 'is unusual and unexpected *by the person to whom it happens.*'" *Id.* (emphasis added). The court held that, "[i]f one cause operates upon several at one time, it cannot be regarded as a single incident, but the injury to each individual is a separate accident." *Id.* at 325.

cause does not imply that we agree with the defendants' argument that there were three separate occurrences. Determining the number of occurrences requires further analysis." *Id.* The court then analyzed numerous cases and concluded that

> the number of occurrences [is] based on the time-space continuum between the collisions and the insured driver's level of control over the vehicle. Collisions with multiple vehicles constitute one occurrence when the collisions are nearly simultaneous or separated by a very short period of time and the insured does not maintain or regain control over his or her vehicle between collisions. When collisions between multiple vehicles are separated by a period of time or the insured maintains or regains control of the vehicle before a subsequent collision, there are multiple occurrences.

*Id.* at 1114.

Here, though there were two liable parties, the policy limit very plainly referred to "all damages ... arising out of 'bodily injury' sustained by *any one person* in *any one accident.*" (Emphasis added.) Though both the owner and the operator were legal causes of Cherity Kerns's injuries in the sense that both of their negligent acts contributed to her injuries, there was but

one event causing the harm overall—the single head-on collision. Under the rationale of *Wilkins*, the owner's negligent entrustment was an antecedent cause, but not the most immediate cause of Cherity Kerns's harm; the most immediate cause was the collision with Cherity Kerns's vehicle. Thus, under the holdings in *Shutt*, *Hodgson*, and *Wilkins*, there was but one accident, and the Kernses are not entitled to recover more than the $100,000–per-person limit provided in their policy for UM benefits.[5]

Point II is denied.

**E. Stacking of UM coverage is prohibited by Kansas law.**

■ In their final point, the Kernses argue that the court erred in finding that their stacking argument was precluded by Kansas law. The Kernses argue that, because the real question is whether the policy is ambiguous, the court did not need to engage in a conflict-of-laws analysis; thus, the statutory prohibition, under Kansas law, on stacking uninsured motorist benefits was inapplicable.[6] The Kernses' argument is misplaced.

The court below granted summary judgment for Insurer on this issue, finding the policy language to unambiguously preclude

**5.** The Kernses rely on *Stafford v. State Farm Mutual Automobile Insurance Company*, 27 Kan.App.2d 224, 1 P.3d 924 (2000), to support their claim that they are entitled to $100,000 for each of the two tortfeasors. Though factually similar to this case, *Stafford* is not legally relevant. In *Stafford*, the question the court faced was whether a setoff provision contained within an underinsured motorist coverage provision violated the Kansas statute mandating a minimum amount of coverage. *Id.* at 927. The court held that, in order to maintain compliance with the statute, the policy had to be interpreted so that "[w]hen multiple tortfeasors are involved in an automobile accident, the individual policies should be compared separately with the underinsured motorist coverage." *Id.* at 925.

The *Stafford* court was not asked to—and did not—decide whether multiple contributing causes to a single event constituted a single accident or more than one accident for purposes of determining an insurer's limit on liability for uninsured motorist coverage.

**6.** Under Kansas law, "Coverage under the [uninsured motorist] policy shall be limited to the extent that the total limits available cannot exceed the highest limits of any single applicable policy, regardless of the number of policies involved, persons covered, claims made, vehicles or premiums shown on the policy or premiums paid or vehicles involved in an accident." Kan. Stat. Ann. § 40–284(d).

stacking. In finding that there was no ambiguity, the court noted that "the 'Limit of Liability' section in the UM Provision of [Insurer's] policy [is] a virtual simulacrum[7] of the anti-stacking language in K.S.A. 40–284(d), giving any insured clear notice that [Insurer] will not stack uninsured motorist coverage, even regardless of the number of premiums paid."

The Kernses argue that, under *Williams v. Silvola*, 234 S.W.3d 396 (Mo. App. W.D. 2007), the court was required to determine first whether there was an ambiguity before determining any conflict-of-laws issue. In *Williams*, a Kansas resident, driving a car licensed and registered in Missouri, was rear-ended in Missouri by an uninsured driver. *Id.* at 398. At the time, she had a Kansas automobile insurance policy, covering seven vehicles that were all garaged in Kansas, which provided UM coverage limits of $50,000 per person or $100,000 per occurrence. *Id.* The driver suffered over $350,000 in damages and made a claim for UM benefits against the policy. *Id.* The insurer paid out the policy limit of $50,000, and the driver sued the insurer for an additional $300,000, arguing that "under the clear language of each of the insurance policies, Missouri law, the state where the accident occurred, governs the issue of whether the policies may be 'stacked.'" *Id.* The policy's limit of liability section provided that "[t]he limits of liability shown in the Declarations apply subject to the following exceptions: ... *Subject to the law of the state of the occurrence*, we will pay no more than these maximums regardless of the number of vehicles insured, insured persons, claims, claimants, policies, or vehicles involved in the occurrence." *Id.* at 401. The trial court agreed, and the insurer appealed. *Id.* at 398–99.

On appeal, the insurer argued that "choice[-]of[-]law principles dictate that Kansas law governs and, under Kansas law, stacking of insurance policies is prohibited." *Id.* at 399. After acknowledging that there was no dispute that Missouri law required multiple UM coverages to be stacked and that Kansas law prohibited such stacking, this court noted that, even under Kansas law, an insurer could be deemed to have waived the protection of Kansas's anti-stacking law. *Id.* at 399–400. And because of the inclusion of the phrase, "subject to the law of the state of the occurrence," there was a question as to whether the insurer waived the protection of the Kansas anti-stacking statute. *Id.* at 400. Thus, we concluded, "even though Kansas law prohibits stacking of uninsured motorist coverage, because an insurer may be estopped from claiming the benefit of Kansas's anti-stacking policy, if the insurance policy is ambiguous, under the law of either Missouri or Kansas, the policy must be construed in favor of the insured." *Id.* For this reason, alone, we held that "the first question that must be answered is whether the trial court erred in finding the policy ambiguous." *Id.*

Contrary to the Kernses' argument, *Williams* did not hold that ambiguity must always be addressed before a conflict-of-law analysis is undertaken. Rather, it was the language of the policy at issue in *Williams* that dictated that order of analysis, because the provision alleged to be ambiguous had the appearance of a choice-of-law provision. That is not the situation in this case. The ambiguity alleged does not involve any choice-of-law provision; instead, it is directed to whether the policy is ambiguous as to the availability of stacking. And, on this question, as noted in

---

7. A simulacrum is "[a]n image or representation." American Heritage® Dictionary of the English Language, Fifth Edition. (2011). Retrieved March 3, 2017, from http://www.the freedictionary.com/simulacrum.

*Williams*, Missouri and Kansas law conflict. Accordingly, we must engage in a conflict-of-laws analysis before addressing the alleged ambiguity.

It is worth noting that the Kernses have never challenged the circuit court's determination that Kansas law governs. In fact, in Point II, they directly argue that "the substantive law that applies to this dispute on this issue between Plaintiffs and Defendant Alliance Indemnity Company, with regard to coverage under the Alliance Indemnity Company policy, is the substantive law of the state of Kansas." And, though they argue that a conflict-of-laws analysis is unnecessary in Point III, noticeably absent from their argument is any suggestion that application of Missouri law would be required under a conflict-of-laws analysis.

"Missouri adopted sections 188 and 193 of the Restatement (Second) of Conflict of Laws (1971) for choice-of-law issues in casualty insurance contracts." *Viacom, Inc. v. Transit Cas. Co.*, 138 S.W.3d 723, 724–25 (Mo. banc 2004).

> Section 188 applies to policies with no choice-of-law provision – as here. It provides that the law of the state with the most significant relationship to the transaction and parties governs. Restatement (Second) of Conflict of Laws section 188(1). It also provides what contacts are considered: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties."

*Id.* at 725 (quoting Restatement (Second) of Conflict of Laws section 188(2)). "Section 193 states that the 'validity of ... [the] insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy....'" *Id.* "By that section's comment b, the location of the insured risk is given greater weight than any other single contact in determining which state's law controls, although less weight when the policy covers a group of risks scattered throughout two or more states." *Id.*

Here, all parties to the accident were Kansas residents, the accident occurred in Kansas, and the policy at issue covers vehicles garaged only in Kansas. It appears that the sole connection to Missouri involved is that the rental vehicle Cherity Kerns was driving was registered in Missouri. Thus, it is clear that under a conflict-of-laws analysis, Kansas law governs this dispute.

According to § 40–284(d) of the Kansas statutes, "Coverage under the [uninsured motorist] policy shall be limited to the extent that the total limits available cannot exceed the highest limits of any single applicable policy, regardless of the number of policies involved, persons covered, claims made, vehicles or premiums shown on the policy or premiums paid or vehicles involved in an accident." This statute "clearly and unambiguously restricts the total limit available under a policy to an amount equal to the highest limits of any single applicable policy 'regardless of the number of policies involved, persons covered, claims made, vehicles or premiums shown on the policy or premiums paid or vehicles involved in an accident.'" *Brown v. Farmers Ins. Co., Inc.*, 31 Kan.App.2d 419, 65 P.3d 1063, 1068 (2003).

Much like the language in § 40–284(d), the limit of liability section of the UM coverage endorsement provides:

> A. The limit of liability shown in the Declarations for each person for

Uninsured Motorists Coverage is our maximum limit of liability for all damages, including damages for care, loss of services or death, arising out of "bodily injury" sustained by any one person in any one accident. Subject to this limit for each person, the limit of liability shown in the Declarations for each accident for Uninsured Motorists Coverage is our maximum limit of liability for all damages for "bodily injury" resulting from any one accident.

This is the most we will pay regardless of the number of:

1. "Insureds";
2. Claims made;
3. Vehicles or premiums shown in the Declarations;
4. Premiums paid; or
5. Vehicles involved in the accident.

With regard to stacking, the Kansas statutory prohibition applies—even in the absence of anti-stacking language in the policy—unless the insurer has undertaken some action to waive the statutory protection. *Eidemiller v. State Farm Mut. Auto. Ins. Co.*, 261 Kan. 711, 933 P.2d 748, 756 (1997); *Brown*, 65 P.3d at 1067. The only case cited by the Kernses regarding waiver is a Missouri case where an insurer included express language in its policy suggesting that the policy was to be governed by the state of occurrence, rather than exclusively Kansas law. *See Williams*, 234 S.W.3d at 400. Other than citing the *Williams* case, however, the Kernses have not argued that Insurer did anything that would constitute a waiver of the statutory protection against stacking. Instead, they argue that the anti-stacking language of the limit of liability section is rendered ambiguous by language in the other insurance section. But, in making this argument, they fail to cite any Kansas authority indicating that the language they rely on either renders a limit of liability section ambiguous or that any resulting ambiguity would somehow negate the effect of the statutory prohibition on stacking.

In short, under Kansas law, stacking of UM coverage is prohibited. While an insurer may waive this statutory protection, the Kernses have failed to identify any action on the part of Insurer constituting such a waiver. Thus, their request to stack multiple UM coverages is precluded.

Point III is denied.

## Conclusion

The circuit court did not err in either granting Insurer's motion for summary judgment or denying the Kernses' motions. Its judgment is affirmed.

Thomas H. Newton, Presiding Judge, and James Edward Welsh, Judge, concur.